FILED

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**FORT WAYNE DIVISION**

2010 APR -9  PM 2: 16

STEPHEN R LUDWIG CLERK
U.S. DISTRICT COURT
FOR THE NORTHERN DISTRICT
OF INDIANA

| | |
|---|---|
| MEMCOR-TRUOHM, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| RAYTHEON COMPANY, | ) |
| As successor-in-interest to | ) |
| E-systems, Inc., | ) |
| Defendant. | ) |

1 : 10 C V 106

**JURY TRIAL DEMANDED**

**COMPLAINT FOR DECLARATORY JUDGMENT AND/OR**
**DAMAGES AND ATTORNEYS FEES**

Comes now Plaintiff, Memcor-Truohm, Inc., by counsel, and alleges and says as

follows:

**A.    FACTS**

1.    Plaintiff Memcor-Truohm, Inc. ("MEMCOR") is a corporation, which has

a principal place of business in Huntington, Indiana, and which is incorporated in the

State of Indiana.

2.    Defendant Raytheon Company ("Raytheon") is a corporation, which has a

principal place of business at Waltham, Massachusetts, and which is incorporated under

the laws of the State of Delaware.

3.    This Court has subject matter jurisdiction by reason of a federal question

pursuant to 28 U.S.C. § 1331, and pursuant to 28 U.S.C. § 1332, based upon the diversity

of citizenship of the parties, the amount in controversy being in excess of Seventy-Five

Thousand Dollars ($75,000.00), exclusive of interest and costs.

4.     At some time subsequent to October 13, 1986, Raytheon acquired E-Systems, Inc. ("E-Systems"), and is the successor-in-interest to E-Systems.

5.     As successor-in-interest to E-Systems, Raytheon is responsible for and subject to any environmental liabilities incurred by E-Systems prior to its acquisition by Raytheon.

6.     Prior to October 13, 1986, E-Systems owned and occupied certain land and buildings located at 1320 Flaxmill Road, Huntington, Indiana (the "Facility").

7.     For a period of at least 20 years prior to October 13, 1986, E-Systems (and/or its predecessors-in-interest) used the Facility to engage in the manufacture of tactical radios for the United States government, electronic components and various other products for commercial customers and the United States government.

8.     During this same period of time, E-Systems used a portion of said facility for the painting, irriditing, impregnation and degreasing of radio components, resistive products and other manufactured items.

9.     In the course of these operations E-Systems used chemical substances or compounds containing trichloroethylene ("TCE") and other hazardous substances.

10.    During the course of E-Systems's occupation and use of the Facility, and as a result of its operations, TCE and other hazardous substances were released into the environment.

11.    As a result of E-Systems' occupation and use of the facility, various liabilities and costs associated with E-Systems' release of hazardous substances have been imposed upon Plaintiff.

12.     On or about October 13, 1986, MEMCOR purchased said property located at 1320 Flaxmill Road, Huntington, Indiana from E-Systems, pursuant to an agreement, the "Purchase Agreement for Memcor Components", a true and accurate copy of which is attached hereto and incorporated herein by reference as Exhibit "A".

13.     Pursuant to said Agreement, E-Systems, Inc. sold the business and assets of its components manufacturing facility in Huntington, Indiana, including the land and buildings, located at 1320 Flaxmill Road, Huntington, Indiana (the "Facility") to the Plaintiff MEMCOR.

14.     Pursuant to Article 2 of said Agreement, E-Systems, Inc., agreed "to retain any and all liability for violations of EPA and Indiana environmental regulations and statutes occurring prior to January 1, 1983..." with respect to the Facility.

15.     On or about August 29, 1996, MEMCOR entered into an Asset Purchase Agreement with Ohmite Manufacturing Co., Inc. ("Ohmite"), pursuant to which Ohmite acquired from MEMCOR *inter alia*, the Facility located at 1320 Flaxmill Road, Huntington, Indiana. A true and accurate copy of the Asset Purchase Agreement is attached hereto and incorporated herein by reference as Exhibit "B".

16.     Pursuant to Section 5.7 of Exhibit "B", MEMCOR agreed to "defend, indemnify and save [Ohmite] from any liability and costs, known or unknown, past or future, arising out or relating to the release, discharge or migration (including the movements of material through or in air, soil, surface, water, or groundwater) of any hazardous or toxic substance or toxic waste, as these terms are defined by federal law, or from the facilities prior to the Closing, including but not limited to any corrective actions necessary under Sections 3004(u), 3004(v), and 3004(h) of the Resource Conservation

3

and Recovery Act or any action undertaken under any other environmental law to address a release of hazardous waste or hazardous constituent from a solid waste management unit located at its facilities or elsewhere."

17.    Plaintiff MEMCOR incurred costs associated with response to and the remediation of contamination arising from E-Systems release of hazardous substances into the environment.

18.    On or about October 31, 2000, Heico Ohmite, LLC, formerly known as Ohmite Manufacturing Co., Inc., conveyed the property including the Facility by deed to Innovative Packaging Associates, Inc. ("Innovative").  A true and accurate copy of said deed is attached hereto and incorporated herein by reference as Exhibit "C".

19.    In 2006, MEMCOR was notified by Innovative that  a Phase 2 environmental study had revealed further contamination at the site, and Innovative also informed MEMCOR that Innovative intended to enter into a voluntary remediation program ("VRP") with the Indiana Department of Environmental Management ("IDEM") regarding same.

20.    On or about the first week of October, 2006, Mr. A. Paul Harris, President of MEMCOR, had a telephone conversation with Mr. Jeff Axelrod, Senior Environmental Counsel for Raytheon, informing Raytheon of the environmental contamination at the site.

21.    Thereafter, on or about October 11, 2006, Mr. Harris, on behalf of MEMCOR, sent correspondence to Mr. Axelrod of Raytheon providing further information to Mr. Axelrod concerning the environmental contamination at the site, and enclosing a copy of the 1986 Sales Agreement between E-Systems, Inc. and MEMCOR,

4

and a copy of the 1996 Asset purchase Agreement between Ohmite and MEMCOR, as well as copies of the documentation MEMCOR had received from Innovative, including the Phase 2 study, an application for a VRP, a response from IDEM, and Innovative's acceptance of the VRP. A true and accurate copy of this correspondence is attached hereto and incorporated herein by reference as Exhibit "D".

22.     On or about May 29, 2008, Innovative, by correspondence from its counsel, notified MEMCOR that environmental testing had resulted in a finding of the presence of trichloroethylene ("TCE") and/or other potentially hazardous substances under an improved portion of the premises located at 1320 Flaxmill Road owned by Innovative Packaging Associates, Inc. A true and accurate copy of this correspondence is attached hereto and incorporated herein by reference as Exhibit "E".

23.     In this correspondence (Exhibit "E"), Innovative made demand that MEMCOR assume responsibility for the costs of continued response, testing and remediation associated with the finding of the TCE and/or other potentially hazardous chemical substances or compounds.

24.     On or about October 23, 2008, counsel for MEMCOR sent correspondence to Mr. Axelrod of Raytheon, demanding that Raytheon honor its contractual obligations as successor to E-Systems, Inc. under the Asset Purchase Agreement (Exhibit "A"), and hold MEMCOR harmless with respect to costs of response to and the remediation of the environmental contamination at the site. This correspondence also transmitted a copy of the demand by Innovative (Exhibit "D") that MEMCOR assume responsibility for the costs of continued testing and remediation, if any, connected with this matter.

5

25.     Thereafter, MEMCOR provided further documentation and other information concerning the site to Raytheon.

26.     On or about July 27, 2009, MEMCOR's counsel requested that Raytheon respond to MEMCOR's demand that Raytheon indemnify it and hold it harmless with respect to the costs of response to and remediation of the environmental contamination at the site.

27.     MEMCOR has suffered damages, expenses, and costs, including response costs within the meaning of 42 U.S.C. § 9601(25), as a result of the conduct of Raytheon and E-Systems, Inc., Raytheon's predecessor-in-interest, for which MEMCOR is entitled to recover legal damages.

28.     A real, live, and active controversy exists between the parties and a declaratory judgment is an appropriate remedy as to future expenses and costs and as to Raytheon's obligation to indemnify and defend MEMCOR.

## B.     CLAIMS FOR RELIEF

### COUNT I: CONTRACTUAL LIABILITY

29.     MEMCOR incorporates by reference the allegations of Paragraphs 1 through 28 as if fully set forth.

30.     MEMCOR is entitled to contractual indemnity from Raytheon, under the terms of the Purchase Agreement dated October 13, 1986, for any past, present and future expenses and costs imposed upon it by reason of E-Systems' release of TCE and/or other hazardous substances into the environment.

## COUNT II: LIABILITY UNDER CERCLA

31.    MEMCOR incorporates by reference the allegations of Paragraphs 1 through 28 as if fully set forth.

32.    MEMCOR is entitled to recover from Raytheon, as successor-in-interest to E-Systems, any response costs it has incurred and may incur in the future, under federal statute, namely Section 107 of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9607.

## COUNT III: COMMON LAW LIABILITY

33.    MEMCOR incorporates by reference the allegations of Paragraphs 1 through 28 as if fully set forth.

34.    MEMCOR is entitled to common law indemnity from Raytheon as successor-in-interest to E-Systems.

## COUNT IV: LIABILITY UNDER INDIANA STATUTE

35.    MEMCOR incorporates by reference the allegations of Paragraphs 1 through 28 as if fully set forth.

36.    MEMCOR is entitled to recover from Raytheon, as successor-in-interest to E-Systems, the reasonable costs of the remedial action with respect to the hazardous substances released at the Facility, pursuant to Ind. Code § 13-30-9-2.

### C.    **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, Memcor-Truohm, Inc. prays that the Court grant judgment against Defendant Raytheon Company, and award Plaintiff damages (including attorney fees) in a reasonable sum; that the Court enter a declaratory judgment that

7

Raytheon, as successor-in-interest to E-Systems, is responsible for environmental costs incurred at the Facility and must indemnify or make contribution with regard to any costs incurred by Plaintiff with respect to contamination at the Facility; and that the Court grant Plaintiff all other and proper relief.

Respectfully submitted,

**EILBACHER FLETCHER, LLP**

James P. Fenton, #6808-02
803 S. Calhoun Street, Suite 400
Fort Wayne, IN 46802
Telephone: (260) 425-9777
Facsimile: (260) 424-9177
Email: fenton@eflawyers.com

## JURY DEMAND

Plaintiff, Memcor-Truohm, Inc., by counsel, hereby demands jury trial of all matters so triable herein.

James P. Fenton

8

$\widehat{32}$

5

## PURCHASE AGREEMENT FOR MEMCOR COMPONENTS

Agreement entered into this _13th_ day of _October_ ,
1986 by and between E-Systems, Inc., a Delaware Corporation with
its principal office at 6250 LBJ Freeway, Dallas, Texas 75240,
hereinafter referred to as "Seller", and Memcor-Truohm Inc.,
Huntington, State of Indiana, and Messrs. Arthur Paul Harris,
Jeffrey R. Crawford, and Raymond E. Vanderspool hereinafter
collectively referred to as "Buyer".

### RECITALS

WHEREAS, Seller desires to sell the business and assets
of its Components manufacturing facility in Huntington, Indiana,
hereinafter referred to as "Components".

WHEREAS, Buyer desires to purchase and acquire such
business and assets from Seller.

WHEREAS, Seller has agreed to sell and Buyer has agreed
to purchase the Components business and assets from Seller for the
purchase price and pursuant to the terms and conditions
hereinafter set forth.

NOW THEREFORE, in consideration of the mutual covenants
and agreements contained herein Buyer and Seller agree as follows.

1.      Assets Being Transferred

Upon the terms and subject to all the conditions stated
herein, and upon payment of the purchase price and the performance
by each of the parties hereto of its obligations hereunder, Seller
hereby agrees to convey, transfer and deliver to Buyer on the
Closing Date or at such other time as is specified below, and

**EXHIBIT**

**A**

Buyer agrees to acquire and accept as provided herein on the
Closing Date all of Seller's right, title and interest in and to
all of the following assets:

a.  All assets in Huntington, Indiana owned by
    Components and used exclusively in the manufacture
    of its product lines, including without limitation
    machinery and equipment, furniture, fixtures,
    finished goods, work-in-process, materials, raw
    supplies, inventories, tools, jigs, patterns, dyes,
    prepaid expenses, deferred expenses and accounts
    receivable in an amount equal to current liabilities.

b.  The land and buildings currently leased and occupied
    by Components at 1320 Flaxmill Road, Huntington,
    Indiana.  Conveyance of real property shall be by
    Special Warranty Deed subject to all exceptions of
    record, and subject to all exceptions in the
    conveyance to Seller.  Seller shall provide Buyer
    with evidence of the ability of Seller to obtain
    title insurance in amount of $1,120,000.

c.  All know-how, designs, proprietary rights, data,
    U.S. Patent Number 4,037,072, drawings, prototypes,
    trade secrets, processes, and technology currently
    owned by Components and used exclusively in the
    manufacture of its present product lines.  Rights in
    proprietary data will be assigned to Buyer.  Any
    necessary filings, recordations, and related fees
    will be the responsibility of Buyer.

d.  All rights, obligations, and responsibilities of
    Seller related to Components under contracts,
    purchase orders, purchase commitments, licenses, and
    representative agreements.  All books and records of
    Components relating to plant and production

operations including personnel records, customer
lists, sales and credit records.  Such documents
shall not be destroyed without Seller's prior right
to receive and retain such documents.  Seller
reserves the right to make and retain copies of any
or all of such documents at any reasonable time.

e.   To the extent the assignment of any contract,
license, agreement, commitment or other asset
included in the assets to be assigned to Buyer
pursuant to the provisions hereof shall require the
consent of any third party or shall be subject to
any equity or option in any other person.  The
novation or assignment shall be subject to those
rights.  The exercise of those rights shall not
constitute a breach of this agreement.  Seller
shall, however, attempt to produce consents to any
such assignment which with respect to those assets
or properties which are assignable with the consent
of one or more third parties.  If any such consent
is not obtained, Seller shall cooperate with Buyer
in any reasonable arrangements such as
subcontracting, designed to provide Buyer the
benefits and burdens of such contracts including
enforcement of any and all rights of Seller against
the other party thereto arising out of breach or
cancellation thereof by such party or otherwise.
Buyer shall reimburse Seller for any out-of-pocket
expenses incurred by Seller in connection with this
cooperation if such expenses exceed an aggregate of
$5,000.00.  Seller agrees to seek prior approval
from Buyer for expenses in excess of an aggregate
$15,000.

2.      Liabilities

    Except as expressly provided in this agreement, Buyer
shall assume all current or potential liabilities and obligations

-3-

of Components incurred prior to or existing on the Closing Date.
Buyer shall indemnify and hold Seller harmless against all such
liabilities and obligations including reasonable attorney's fees
and costs and expenses of any subsequent litigation related
thereto.

Buyer agrees to accept responsibility for all commitments
including related costs and applicable overhead expenses incurred
by Seller for the benefit of Components or on behalf of Components
prior to the Closing Date but not charged to Components as of that
date. The parties agree that, among other things, this paragraph
applies to 1986 cost allocations and accruals relating to Seller
stock ownership programs and other benefits and services provided
to or for Components, its employees, or vendors by Seller or any
of Seller's divisions or subsidiaries which have not been charged
to Components as of the Closing Date. Buyer agrees to provide
funds to Seller for the expenditures described in this paragraph
no later than 60 days after receipt from Seller of each invoice
for such expenses. The parties to this Agreement understand that
the aforementioned obligation applies to all payments made by
Seller for insurance benefits paid to employees of Components.
All support services provided to Components by E-Systems will be
discontinued on the Closing Date and will become the sole
responsibility of Buyer. The parties further agree that the G and
A expense reflected in the Balance Sheet ultimately used to
determine the Cash Payment shall be considered as accurate and
shall not be subject to adjustment at year end. The parties
understand that this agreement is not to be construed as requiring
Buyer to assume or Seller to retain the current Components'
collective bargaining agreement or the retirement programs
specified therein.

Except as expressly provided in this Agreement Buyer
shall indemnify and hold Seller harmless against all costs,
expenses, losses, and liabilities which Seller may incur arising
after the Closing Date due to Buyer's performance or
non-performance of the transferred contracts or out of Buyer's
failure to discharge any of its liabilities or obligations assumed

pursuant to this agreement, including reasonable attorney's fees and costs and expenses of any subsequent litigation related thereto.

Notwithstanding any other provision of this agreement, Seller hereby agrees to retain any and all liability both current and future relating to the E-Systems' involvement in the Wayne Reclamation and Recycling Site in Columbia City, Indiana for waste materials delivered to that site prior to the Closing Date. Additionally, Seller agrees to retain any and all liability for violations of EPA and State of Indiana environmental regulations and statutes occurring prior to January 1, 1983 and for disposals of hazardous chemicals shipped from Huntington facilities prior to January 1, 1983.  Likewise, Buyer agrees to retain any and all liability for violation of EPA and State of Indiana environmental regulations and statutes occurring on or after January 1, 1983 and for disposals of hazardous chemicals shipped from the Huntington facilities on or after January 1, 1983.

Seller agrees to indemnify and hold Buyer harmless against all claims, expenses, losses, and liabilities which Buyer may incur arising from products sold and shipped by Components prior to the Closing Date.

3.      Payment

Buyer shall pay to Seller in consideration for the assets to be transferred hereunder the purchase price as well as the other good and valuable consideration identified below.

The purchase price shall be paid as follows:

a.      Buyer shall transfer by wire to a bank of Seller's choosing to be received by Seller at said bank on or before 1 p.m. Central Daylight Savings Time on the Closing Date, $3,680,000.00, (hereinafter referred to as the "Cash Payment").

b.  The parties may mutually agree to revise the Cash
    Payment at Closing to reflect the changes in the
    value of Components as described in (1) Components'
    most recent financial statements prepared in
    accordance and consistent with past Division
    practice, or (2) Components' financial statements
    prepared as of the Closing Date in accordance and
    consistent with past Division practice.  The revised
    Cash Payment shall be the Total Stockholder's Equity
    of Components as reflected on line 31 of the
    applicable Balance Sheet selected by Seller, FS-2B,
    which shall be increased by $600,000.00 and reduced
    by (1) $350,000.00, (2) Cash as shown on line 2 of
    the FS-2A, and (3) Accounts Receivable as shown on
    line 10 of FS-2A in excess of Total Current
    Liabilities as shown on line 15 of FS-2B.  In the
    event the parties are unable to agree, a Balance
    Sheet will be constructed as of the Closing Date.
    In determining the cash payment all calculation
    formulas will remain the same.

c.  Seller shall retain title to Components' Accounts
    Receivable in excess of Total Current Liabilities.
    The specific Accounts Receivable to be retained by
    Seller will be chosen by Seller.  This choice will
    be communicated to Buyer as soon after selection as
    reasonably practicable.  In the event the retained
    Accounts Receivable are not collected by Seller
    within ninety days of Closing, Buyer shall within
    ten days of receipt of notification thereof provide
    immediately available funds to Seller in the amount
    of such delinquent Accounts Receivable by Certified
    Check or Wire Transfer to Seller's account in any
    bank of Seller's choosing.  Following payment, title
    to such Accounts Receivable shall be transferred to
    Buyer.

d.   Seller shall retain all Cash held or controlled by
Components as reflected in the 28 September 1986
Balance Sheet, FS-2A.

e.   In the event Buyer breaches this agreement and fails
to complete this transaction on the Closing Date,
Seller shall be entitled to sell the assets to other
parties without further obligation to Buyer.

f.   For purposes of paragraphs c and d above, the
Components' Balance Sheet dated 28 September 1986
shall be used.  In the event revision of the Cash
Payment is made pursuant to paragraph b above,
paragraphs c and d above will also be revised to
reflect the amounts specified in the applicable
Balance Sheet selected by Seller.

4.   Asset Protection

Buyer covenants and agrees to properly care for the land,
equipment, buildings and improvements thereto and other assets
used or controlled by or available to Components and shall not
commit or permit any waste or injury to those assets.  Buyer will
make all necessary repairs to the aforementioned assets.  Such
repairs shall be equal in quality to the original work.  Buyer
will provide all needed maintenance and repair services and will
at all time maintain the assets in as good order and condition as
they were as of the Closing Date.  In furtherance of these
obligations, Buyer will secure and maintain proper insurance and
take all actions necessary to preclude liens or encumbrances from
being perfected against the assets.  These obligations do not
apply to the assets used solely to produce the products of
Components.  The obligations with respect to assets owned by
Seller or used in both the production of Components products and
Seller's products shall extend for 10 years following Closing.
This obligation shall not apply to equipment purchased or leased
by Seller and removed from the Components' facility by Seller.

7.

5.    Representations and Warranties of Seller

      Seller hereby represents and warrants to Buyer that:

a.    Corporate Existence

      Seller is a corporation duly organized and validly
      existing and in good standing under the laws of the
      State of Delaware and has the corporate power to
      carry on its business as is now being conducted.

b.    Authority of Seller

      Execution and delivery of this agreement and any
      supplemental agreements by Seller and the
      consummation of the transaction contemplated hereby
      including transfer to Buyer of the assets, and the
      performance by Seller of its obligations and
      undertakings under this agreement and any
      supplemental agreements are within the Corporate
      power and authority of Seller where duly authorized
      and approved by the Board of Directors of Seller.
      No other Corporate authorization or approval is
      required for any or all of the foregoing.  This
      agreement and any supplemental agreements when duly
      executed by authorized officers of Seller will
      constitute legal, valid, and binding obligations of
      Seller enforceable against it in accordance with the
      terms hereof.

c.    Liens and Encumbrances

      Except as stated in Attachment A to this Agreement,
      as of the Closing Date, Seller will have sold,
      transferred, and assigned to Buyer good and
      marketable title to the assets free and clear of any
      security interest, pledges, liens, charges and

restrictions of any nature whatsoever except as specifically provided herein.

d.  Insurance Coverage

Seller maintains policies of fire, liability and other forms of insurance with reputable and sound insurers covering the assets in amounts and against such lawsuits and risks including product's liability and workman's compensation insurance as Seller believes is necessary and valid policies of such insurance will be outstanding and duly enforced until Closing.

e.  Representations At Closing

Where expressly provided or contemplated, the representations and warranties of Seller set forth in this agreement shall be true at and as of the Closing Date as though such representations and warranties were made at and as of such time.  Unless representations and warranties must survive Closing in order to complete their intended purpose such representations and warranties shall not survive Closing.

f.  Except as implicitly or expressly disclaimed in Article 6e herein, Seller hereby warrants that there are to the best of Seller's knowledge and belief no material mistatements or omissions unknown to Buyer which are necessary to make an informed judgment relating to the transaction contemplated herein.

5.1  Representations and Warranties of Buyer

Buyer hereby represents and warrants to Seller that:

-8-

a.   This agreement and the supplemental agreements
     executed and to be executed by Buyer hereunder when
     executed by the authorized representatives of Buyer
     will be valid and binding agreements of Buyer
     enforceable in accordance with and subject to the
     terms and conditions hereof and thereof.

b.   No Defaults

     Buyer is not in default with respect to the terms of
     any contract, indenture, mortgage, judgement order
     or decree impairing Buyer's right to or authority to
     enter into and perform this agreement nor shall
     execution or performance of this agreement
     constitute a default with respect to any such
     obligation.

c.   Financing Commitments

     Buyer has current funding or financing commitments
     for the immediately available funds, Cash Payment,
     to be paid to Seller at Closing, and for working
     capital loans in amounts deemed acceptable to Seller.

d.   No Material Misstatements

     No representations or warranties by Buyer in this
     agreement nor any documents, statements,
     certificate, attachment, or schedule furnished or to
     be furnished Seller pursuant hereto or in connection
     with the transaction contemplated hereby contains or
     will contain to the best knowledge and belief of
     Buyer's officers any untrue statement of a material
     fact or omits or will omit to state a material fact
     necessary to make an informed judgement relating to
     the statement or facts contained herein.

e.   Where expressly provided or contemplated the
representations and warranties of Buyer set forth in
this agreement shall be true at and as of the
Closing Date as though such representations and
warranties were made at and as of such time.   Unless
survival of such representations and warranties is
needed in order to complete their intended purpose,
such representations and warranties shall not
survive Closing.

f.   <u>Tradenames and Trademarks</u>

Buyer will not use the tradename and trademark
(E-Systems) or any derivation thereof, or any trade
name which in the sole opinion of Seller is
confusingly similar to E-Systems.   Existing
inventory and work-in-process bearing E-Systems'
name may be used by Buyer provided that a sticker or
similar concealing mechanism bearing Buyer's name is
placed over the E-Systems' name.   Buyer shall have
complied with this agreement and shall have no
liability to Seller hereunder if the concealing
sticker or similar mechanism is in place over
E-Systems' name when the inventory or
work-in-process is shipped, mailed, or otherwise
delivered by Buyer.

g.   Omitted

h.   Buyer hereby warrants that it will for a period of
10 years following Closing maintain the capability,
including personnel and equipment, to produce the
products and provide the services it has produced or
provided during any time since 1981.   This
obligation shall not apply to the equipment
purchased or leased by Seller and removed from the
Components' facility by Seller.

-11-

i.   Buyer hereby warrants that it will use its labor and
equipment to provide any service or product to
Seller, or any Division or subsidiary thereof, that
it has provided or produced at any time since 1981
in support of E-Systems, Inc.  This labor will be
provided to Seller at Buyer's cost including
associated overheads but excluding interest and
depreciation.  This right is assignable at Seller's
sole option.  All material to be incorporated into
the final product will be supplied by Seller.  Buyer
will upon receipt of such material take all
reasonable steps to store, protect, and insure such
material against loss, destruction, or other
diminution in value.

j.   Seller retains an option to purchase at any time any
or all of the equipment used primarily to produce
the products it has for Seller at any time since
1981 for the book value of such equipment on
Seller's books immediately prior to Closing.  The
equipment referred to above shall include that
equipment identified in Attachment 1, attached
hereto and incorporated by reference herein and in
addition shall include other tools and equipment (1)
used exclusively in the production of Seller's
products as described above, and (2) used in part in
the production of such products which tools and
equipment for whatever reason are no longer
necessary for Buyer's product lines.

The tools and equipment specificed above may not be
sold without the prior written consent of Seller who
reserves the right to exercise the option specified
above.  If the value is zero, Buyer will be paid one
dollar for the transfer of ownership.

In the event this purchase would reduce the
Components borrowing capability to an amount less
than the total amount of outstanding loans plus
$200,000, then the equipment will be leased by
Seller for $1 per year until such time the borrowing
capability is equal to or greater than the
outstanding loan balances plus $200,000.  At that
time the equipment sales will be completed as set
forth above.

Following exercise of the equipment purchase option,
Buyer will at Seller's option either transfer the
equipment to Seller F.O.B. Buyer's facility or
retain such equipment for use in producing products
for Seller as specified above.  This retention
obligation will expire ten years following Closing.
Nothing contained in this paragraph j. shall in any
way reduce Buyer's obligations as set forth in
paragraphs h. or i. above relating to the use of
labor and equipment remaining at the Components
facility.

k.   At any time during the ten year production
obligation specified in paragraphs h and i above,
Buyer must seek prior approval of Seller prior to
using the equipment specified in paragraph j above
for producing products to be sold to any party other
than Seller.

6.   Additional Covenants

a.   Bulk Sales

Buyer and Seller agree to waive compliance with any
law relating to bulk sales or bulk transfers which

-13-

is or may be applicable to the transactions
contemplated by this agreement.  In connection with
such a waiver, Buyer shall indemnify and hold Seller
harmless from and against any liability resulting
from such noncompliance.

b.    Cooperation Following Closing

Buyer and Seller agree that each will execute and
deliver to the other any and all documents in
addition to those provided for herein that may be
necessary or appropriate to effectuate the
provisions of this agreement, whether at or after
the Closing Date hereof.  Buyer will promptly
forward to Seller any checks, drafts, or similar
payment documents from third parties for debts or
obligations to Seller not transferred to Buyer as
part of this transaction or otherwise not properly
payable to or the property of Buyer.  Seller will
promptly forward to Buyer any amounts received from
third parties for debts or obligations to Seller
that Seller transferred hereunder to Buyer, or
otherwise not properly payable to or the property of
Seller, and all invoices and other communications
from third parties related to the payments of
obligations assumed by Buyer.

c.    Access to Records

From and after the Closing Date, Buyer and Seller
each covenants and agrees to give the other full
access and rights of copying at all reasonable times
and upon reasonable notice to all books, records,
contracts and documents relating to Components,
which either party may require for purposes of
filing tax returns, preparing financial statements,

or prosecuting, settling, defending claims,
responding to governmental or administrative agency
requests for documents, or any other reasonable
business requirement relating to their respective
period of ownership.  Buyer agrees to cooperate with
Seller by making employees of Buyer as designated by
Seller available to assist with the matters
described above.  Seller agrees to reimburse Buyer
upon submission of invoices for direct salaries and
travel costs of such assistance in excess of 200 man
hours per calendar year.

d.    Expenses, Fees, Sales and Use Taxes

Each of the parties hereto agrees to pay its own
expenses incurred in the course of the transactions
hereunder.  Buyer shall bear all sales and use taxes
and filing fees incurred in connection with the
consummation of the transaction hereunder.

e.    Warranty

Buyer agrees that it has knowledge of the financial
documents and records, accounts receivable,
inventory, contracts, fixed assets, personal
property, business prospects, and general condition
of the business of Components, which is superior to
that of Seller.  This knowledge has resulted in
Buyer's acceptance of the business, assets and
liabilities of Components without regard to any
Seller warranty, representation, or guarantee
regarding the condition or value of Components'
assets, business prospects, or general condition.
Therefore, the assets are being transferred "as is,
where is".  SELLER AND BUYER AGREE THAT SELLER IS
PROVIDING NO WARRANTIES RELATIVE TO THE TRANSFERRED

BUSINESS, ASSETS OR LIABILITIES, INCLUDING
WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A
PARTICULAR PURPOSE WHETHER WRITTEN, ORAL, EXPRESSED,
IMPLIED OR STATUTORY.  SELLER NEITHER ASSUMES NOR
AUTHORIZES ANY PERSON TO ASSUME FOR IT ANY OTHER
LIABILITIES WITH RESPECT TO SUCH BUSINESS OR
ASSETS.  UNDER NO CIRCUMSTANCES SHALL SELLER BE
LIABLE FOR NORMAL WEAR OR TEAR OR FOR ANY
CONTINGENT, INCIDENTAL OR CONSEQUENTIAL DAMAGES OR
EXPENSES DUE TO THE BUSINESS CONDITION OR PROSPECTS
OF COMPONENTS OR TO PARTIAL OR COMPLETE
INOPERABILITY OF THE EQUIPMENT OR ANY OTHER ASSETS
SUPPLIED PURSUANT TO THIS AGREEMENT FOR ANY REASON
WHATSOEVER.

While Seller is providing no warranty with respect
to possible violations of EPA or State of Indiana
environmental laws or products liability, Seller
agrees to idemnify Buyer for liability arising from
such events as stated in Article 2 herein.

f.     Retirement Benefits

       i     Individuals Eligible for Retirement

             (a)  Current Component's employees and
                  Component's employees who are in a lay-off
                  status as of the Closing Date, and who are
                  eligible for retirement under the terms of
                  the E-Systems Salaried Retirement Plan,
                  hereinafter referred as the "Salaried
                  Plan" or the Huntington Hourly Retirement
                  Plan, hereinafter referred as "Hourly
                  Plan", will be given the option
                  exercisable within 90 days of Closing to
                  elect (1) retirement as of Closing under

-16-

the terms of Seller's retirement programs,
(2) purchase by Seller of an annuity for
the benefit of the employee, such annuity
shall include a provision dictating that
payments may be made to the employee at
age 65 or as early as age 55 at a reduced
amount but in no event shall such payments
be made prior to termination of employment
with Buyer, or (3) a lump sum cash payment
equivalent to the present value of accrued
benefits attributable to such employee.

For Option 3 above, amounts to be paid to
or for each employee by the Pension Trust
will be the present value of that
employee's accrued benefits calculated
under the terms of the E-Systems Salaried
or Hourly Retirement Plan in which he or
she is a participant.

For Option 2, the transferred funds will
be equal to that amount necessary to
purchase an annuity from a reputable
insurance company of Sellers choosing,
which annuity will provide benefits
equivalent to those specified in the
respective employee's retirement plan.
For Option 3, the discount rate to be used
to determine the amount of the lump sum
payment shall be the Pension Benefit
Guaranty Corporation's immediate annuity
rate in effect as of the Closing Date.

(b) With respect to Salaried Plan participants
continuing employment with Buyer, Options
1 and 3 will only be offered if the

Internal Revenue Service approves the
termination of the Component's Salaried
participants from the Salaried Plan as a
Partial Plan Termination and allows for
such payments.  These options will become
retroactively effective to the Closing
Date following receipt of approval of the
Partial Plan Termination from the Internal
Revenue Service.  In the event a Partial
Plan Termination is not approved by the
Internal Revenue Service, the employee
will be provided with an annuity as
described in Option 2 above.

(c)   The retirement rights of former employees
who terminated employment with E-Systems
prior to the Closing Date (other than
employees on lay-off status), and who are
eligible for retirement under the terms of
their respective retirement program as of
the Closing Date will be governed by the
terms and conditions of that employee's
specific retirement plan as it applied to
that individual as of the Closing Date.
The assets and liabilities associated with
the accrued benefits of these employees
will be transferred to the Salaried Plan.

ii   Individuals Not Eligible for Retirement

(a)   Current Components' employees and
Components' employees who are in a lay-off
status as of the Closing Date, and who are
not eligible for retirement under the
terms of the Salaried Plan or the Hourly
Plan will be given the option exercisable

-18-

within 90 days of Closing to select either Options 2 or 3 specified in paragraph i above.  Such employees who are not vested as of the Closing Date will become vested in such employee's accrued benefits as of the Closing Date.  The restrictions relating to the exercise of Option 3 specified in paragraph i(b) above will be applicable to Salaried Plan participants ineligible for retirement as of the Closing Date.

(b)   The retirement rights of former employees who terminated employment with E-Systems prior to the Closing Date (other than employees on lay-off status), and who are not eligible for retirement under their respective retirement programs as of the Closing Date will be governed by the terms and conditions of that employee's specific retirement plan as it applied to that individual as of the Closing Date.  The assets and liabilities associated with the accrued benefits of these employees will be transferred to the Salaried Plan.

iii   Employees who fail to make an election will be provided with an annuity as specified in Option 2 above.

iv   Seller reserves the right to pay only a lump sum cash payment to participants in either the Salaried Plan or Hourly Plan whose present value of accrued benefits total $3,500 or less.

v    The program and schedule outlined above is
subject to the approval of the Internal Revenue
Service and the Pension Benefit Guaranty
Corporation as required.  Required approval and
termination requests will be the responsibility
of Seller.

vi   Distributions will be made within 60 days of
receipt of the required approvals from the
Internal Revenue Service and the Pension
Benefit Guaranty Corporation.

g.   Seller hereby agrees to retain responsibility for
providing health, medical and surgical insurance to
salaried and hourly Components' employees retiring
on or before the Closing Date or during the 90 day
option period thereafter (described in Article 6f)
so long as such employees promptly pay their
required program participation contribution.

7.   Deliveries at Closing

At Closing, Seller shall deliver to Buyer the following
items and documents or reasonable substitutes therefor:

a.   A bill of sale transferring with warranties against
encumbrances Seller's right, title and interest in
Components' assets to Buyer.

b.   Possession of all assets being sold.

c.   Opinion of counsel for Seller addressed to Buyer
dated as of the Closing Date in the form set forth
in Attachment 2.

d.   A certificate executed by an officer of Seller
stating that all representations, covenants, and

warranties of Seller in this agreement are accurate
and complete or have been performed or complied with
in all material respects as of the date stated or
the Closing Date.

e.    Certified copies of the Resolutions duly adopted by
      the Board of Directors of Seller, which shall be in
      full force and effect at the Closing Date
      authorizing the execution and delivery of this
      document and the consummation of the transactions
      provided for herein.

f.    Special Warranty Deed as specified in paragraph 1(b).

g.    Evidence of the ability of Seller to obtain title
      insurance in the amount of $1,120,000.

8.    Deliveries at Closing - Buyer

At Closing, Buyer shall deliver to Seller the following
funds, items, and documents or reasonable substitutes therefor:

a.    The currently available funds identified in Article
      3, subparagraph (a) to be transferred by wire to a
      bank of Seller's choosing.

b.    An amount equal to the cash held by Components as of
      the Closing Date will be transferred by wire to a
      bank of Seller's choosing.

c.    Opinion of Counsel for Buyer addressed to Seller
      dated as of the Closing Date in the form set forth
      in Attachment 3.

d.    A Certificate executed by the Buyer stating that all
      representations, covenants, and warranties made by

the Buyer in this agreement are accurate and complete or have been performed or complied with in all materials respects as of the date stated or the Closing Date.

9.    Conditions Precedent to Purchase by Buyer

The obligation of Buyer to consummate this transaction shall be conditioned upon the following (any of which may however be waived by Buyer):

a.    None of Components' assets have suffered any destruction or damage by fire, explosion, or other calamity materially and adversely affecting the conduct of Component's business.

b.    Seller shall have performed and complied in all material respects with all agreements, covenants, undertakings, and obligations which are required to be performed and complied with by it at or prior to the Closing Date.

c.    No litigation, action suit, investigation claim, or proceeding shall be pending or threatened against Seller or Buyer challenging the legality of or restraining acquisition of the assets contemplated herein.

d.    Buyer shall have received an Opinion of Counsel for Seller addressed to Buyer and dated as of the Closing Date in the form set forth in Attachment 2.

e.    All Corporate proceedings required to complete the transactions contemplated by this agreement are reasonably satisfactory in form and substance to counsel for Buyer.

f.    Receipt of evidence of the ability of Seller to obtain and endorse to Buyer title insurance in the face amount of $1,120,000.

10.    Conditions Precedent to Seller's Obligations

The obligations of Seller to consummate this agreement on the Closing Date, and to transfer the assets as provided herein shall be conditioned upon the following (any of which may however be waived by Seller):

a.    The representations, convenants and warranties by Buyer in this agreement shall be accurate and complete or have been performed or complied with and all material respects as of the date stated and the Closing Date.

b.    Buyer shall have performed and complied with all the agreements, covenants, undertakings, and obligations which are required to be performed and complied with by it at or prior to the Closing Date.

c.    No litigation, action suit, investigation claim, or proceeding shall be pending or threatened against the Seller or Buyer challenging the legality or restraining the acquisition of the assets herein contemplated.

d.    Seller shall have received the Opinion of Counsel of Buyer addressed to Seller and dated as of the Closing Date substantially in the form of Attachment 3.

11.    Effective Date and Closing Date

The effective date of this agreement is date of the last signature required for the creation of a binding contract.   The

-23-

Closing Date under this agreement shall be _____.
Closing shall take place on the Closing Date at the office of
Buyer in Huntington, Indiana, or at such earlier time or place as
shall to be fixed by mutual agreement of the parties.

12.     Professional Fees

        Seller shall indemnify Buyer against and hold it harmless
from any loss or expense of any kind or nature resulting or
arising from any claim made by any person or entity alleging that
such person or entity is entitled to a brokers, finders, or like
fee on account of any action by Seller in respect to the
transactions contemplated hereunder.  Buyer shall indemnify Seller
against and hold harmless from any loss, cost, or expense of any
kind or nature resulting or arising from any claim made by any
person or entity that such person or entity is entitled to a
brokers, finders or like fee on account of any action by Buyer in
respect to the transactions contemplated hereunder.

        Each party shall pay the cost of its officers, employees,
attorneys, auditors, accountants or consultants in connection with
the transactions hereunder.

13.     Survival of Warranties

        All representations, warranties and covenants in or
pursuant to this agreement shall be deemed to be conditioned
precedent to the Closing Date and shall not survive the Closing
unless needed in order to complete their intended purpose.
Obligations imposed in Article 2 and 6(f) shall survive Closing.

14.     Confidential Treatment

        Buyer convenants that until such time as the transactions
contemplated by this agreement are consummated on or before the
Closing Date, it will keep and maintain in strict confidence all
information concerning this proposed transaction.  Buyer further

agrees to make no public announcement of this transaction (whether
prior to or following Closing) without the prior written consent
of Seller.

15.    Assignment and Amendments

       This agreement may not be assigned or modified without
the prior written consent of both parties.

16.    Indemnification

       a.    Buyer shall indemnify Seller and hold it harmless
             from and against any and all demands, claims,
             assessments, liabilities, damages, losses, costs and
             expense including reasonable legal and accounting
             fees resulting from or rising out of (1) any
             obligation of Buyer incurred prior to or following
             the Closing Date, (2) any imposition by a third
             party or an attempted imposition of any liability or
             obligation upon Seller that Buyer has assumed
             pursuant to this agreement, or (3) Buyer's failure
             to pay, discharge or perform any of its obligations
             or liabilities which are assumed by Buyer pursuant
             to this agreement.

       b.    With respect to claims by third parties for which
             indemnification is sought by Seller, Seller shall
             promptly notify Buyer of the assertion by third
             party of any claim with respect to which Seller
             seeks indemnification and a description thereof and
             Seller shall permit Buyer through its own separate
             counsel and at its own expense to assume the defense
             of such claim.   Seller shall be entitled to continue
             to be represented at its option and expense by
             counsel of its choice in connection with such claim
             or proceeding, the defense of which Buyer elects to
             assume.   Each party hereto agrees to cooperate with

the other hereto in connection with the defense of any third party claim.  In connection with these matters, each party will make employees designated by the other available on a reasonable basis to the requesting party in the course of proceeding with claims and counterclaims.  The requesting party will reimburse the supplying party upon submission of itemized invoices for the direct salaries and associated travel cost of this cooperation in excess of 200 manhours per calendar year based upon the requesting party's prior written request for such services.

The indemnity obligations under this section shall survive Closing.

17.   Limitation of Liability

Buyer and Seller expressly agree that, except for liability arising from environmental law violations and products liability as described in Article 2 and those obligations imposed in Article 6(f), Seller's liability on any claim or claims of any kind including negligence for any loss or damages arising out of, or in connection with, or resulting from this contract, or from the performance of breach hereof, or use of any equipment or documentation covered by or furnished under this contract shall not in the aggregate exceed $5,000.00.  IN NO EVENT, WHETHER AS A RESULT OF BREACH OF CONTRACT, ALLEGED NEGLIGENCE OR OTHERWISE SHALL SELLER BE LIABLE FOR DAMAGES OR LOSS OF PROFITS OR REVENUE RESULTING THEREFROM OR FOR LIQUIDATED CONTINGENT, INCIDENTAL, CONSEQUENTIAL, SPECIAL OR RESULTING LOSS OR DAMAGE OF ANY KIND, HOWSOEVER CAUSED PROVIDED HOWEVER THAT THE FOREGOING LIMITATIONS ON SELLER'S LIABILITY SHALL NOT APPLY TO ANY LIABILITY FOR BODILY INJURY INCLUDING DEATH RESULTING FROM SELLER'S PERFORMANCE UNDER THIS CONTRACT WHEN SUCH LIABILITY IS DETERMINED TO EXIST IN ACCORDANCE WITH APPLICABLE LAW.

18.    Notice

Whenever notice is required by the provisions of this agreement to be given to parties shall be deemed to be properly given if in writing and delivered personally or mailed postage prepaid as follows:

If to Seller:

E-Systems, Inc.
P. O. Box 660248
Dallas, Texas 75266-0248
Attn: Vice President,
      Secretary and General Counsel

If to Buyer:

Memcor Truohm Inc.
1320 Flaxmill Road
Huntington, Indiana  46750
Attn:  A. Paul Harris
       Chairman and President

Any party may change the party or address to which any such notice shall be delivered by giving the other party written notice of such change in the manner set forth in Section 15.

19.    Miscellaneous Provisions

a.    Successors and Assigns

This agreement shall inure to the benefit of and be binding upon the parties hereto and their respective successors and assigns; provided, however, that neither of the parties hereto may make any assignment of this agreement or of any interest herein without prior written consent of the other party.

b.   <u>Headings</u>

The captions preceding each section of this agreement have been inserted solely for the convenience and reference of the reader and are not a part of this agreement.  The agreement shall be construed as though said captions had not been inserted.

c.   <u>Attachments</u>

The attachments specified in this agreement are hereby incorporated by reference and attached hereto.

d.   <u>Choice of Law</u>

This agreement has been signed in and shall be construed in accordance with and governed by the laws of the State of Texas.

e.   <u>Execution in Counterparts</u>

This contract may be executed in one or more counterparts each of which shall be deemed an original but all of which shall constitute the same agreement.

f.   <u>Integrated Document</u>

This agreement and the documents to be delivered hereunder constitute the entire agreement between the parties.  All negotiations between the parties are merged into this agreement.  There are no representations, warranties, covenants, understandings or agreements between the parties hereto other than those incorporated herein and to be delivered hereunder.

g.   <u>Modifications</u>

    This Agreement shall not be amended or modified, nor shall any waiver of this provision or any other right provided herein be effective, unless set forth in writing and executed by both of the parties hereto.  The duly authorized waiver of any breach of any term, covenant, or condition herein contained shall not be deemed to be a waiver of any subsequent breach of the same or any other term, covenant or condition herein contained.

    IN WITNESS WHEREOF, the parties have caused their signatures to be affixed to this agreement by duly authorized officers as of the day and year first above written.

SELLER:

E-SYSTEMS, INC.

By _Robert E Dyde_

Title _Associate Counsel_

BUYER:

MEMCOR-TRUOHM INC.

Arthur  Paul  Harris
Chairman and President

-29-

ATTACHMENT A REV appx

## Liens and Encumbrances

Other than those set forth below, there are no current security interests, pledges, liens, charges or restrictions upon the Acquired Assets. The exceptions are:

1. Statutory encumbrances arising from the accrual of federal, state or local taxes not yet due and payable.

2. Encumbrances created with the knowledge or acquiescence of Buyer or as a result of operations during the period of Buyer's managerial control of Components.

3. Encumbrances of a minor nature arising in the ordinary course of business.

(5)

## ATTACHMENT 1

| QUANTITY | DESCRIPTION | APPRAISED VALUE |
|---|---|---|
| 1 | Ex-Cell-O Vertical Milling Machine Slo Syn Controls, Serial Number 6022535 | 4,500.00 |
| 1 | Ex-Cell-O Double Head Milling Machine, Slo Syn Controls, Serial Number 6022606-1/2 | 6,000.00 |
| 1 | Ex-Cell-O Double Head Milling Machine, Serial Number 6022532-1/2 | 6,000.00 |
| 1 | Clausing Vertical Drill Press, Model 1655, w/Multi Drill Attachment, Serial Number 116118 | 1,250.00 |
| 1 | TOS Horizontal Milling Machine, Type FB25H, Serial Number 166092 | 8,500.00 |
| 1 | TOS Horizontal Milling Machine, Type FB32H, Serial Number 44740, 1967 | 8,500.00 |
| 1 | Excello Vertical Milling Machine, Player Industries Multi Mill Attachment, Slo-Syn, Serial Number 6022622 | 4,500.00 |
| 1 | Excello Vertical Milling Machine w/Slo-Syn Controls, Serial Number 6022609 | 4,500.00 |
| 1 | Excello Double Head Milling Machine w/Slo-Syn Controls, Serial Number 6022534-1/2 | 6,000.00 |
| 1 | Delta Drill Press w/Zagar Gearless Drill Head Attachment, Serial Number 1360263 | 1,400.00 |
| 1 | Bridgeport 3-Head Vertical Milling Machine w/Slo-Syn Controls, Serial Number 123672 | 3,500.00 |
| 1 | Pratt & Whitney Model C Tape-O-Matic Machining Center, Serial Number T51047 | 6,500.00 |
| 1 | Pratt & Whitney Model B Tape-O-Matic Machining Center | 4,200.00 |
| 1 | Special Horizontal Drilling Machine | 200.00 |
| 1 | Special Shop Built Drilling Machine | 200.00 |
| 1 | Hypneumat Model SP38EHB-8 Drilling & Tapping Machine, Serial Number 385123 | 400.00 |

| QUANTITY | DESCRIPTION | APPRAISED VALUE |
|---|---|---|
| 2 | Netznik Hydraulic Multi Spindle Drills, Serial Number M1327 | 750.00 |
| 1 | Netznik Hydraulic Multi Spindle Drill, Serial Number M1327-1 | 1,000.00 |
| 1 | Clausing Model 1655 6-Head Drill Press, w/Zagar Attachments, Serial Number 116119 | 3,250.00 |
| 1 | Clausing Model 2287 Drill Press w/Multi Drill Attachment, Serial Number 511423 | 1,500.00 |
| 1 | Clausing 6-Head Drill Press, Model 1655, Serial Number 116218 | 1,200.00 |
| 1 | Delta Drill Press, Serial Number 172-5667 | 225.00 |
| 1 | Shop Built Multi Drill | 500.00 |
| 1 | Rockwell Drill Press, Serial Number 1625938 | 225.00 |
| 1 | Delta Drill Press, Serial Number 49-3389 | 175.00 |
| 1 | Burgmaster Rotating Head Drill Press, Serial Number 2071 | 1,400.00 |
| 1 | Netznik Multi Drill, Serial Number M-1329 | 1,000.00 |
| 1 | Netznik Multi Drill, Serial Number M-1328 | 1,000.00 |
| 1 | Clausing 4-Head Drill Press w/4 Zagar Multi Drill Attachments, Serial Number 104289 | 3,500.00 |
| 1 | Clausing 3-Head Drill Press w/Zagar Multi Drill Attachments, Serial Number B605269 | 2,250.00 |

# ASSET PURCHASE AGREEMENT

## AMONG

### OHMITE MANUFACTURING COMPANY, INC.,

### MEMCOR-TRUOHM INC.,

### A. PAUL HARRIS

### AND

### JEFFREY R. CRAWFORD

This agreement of purchase and sale ("Agreement") is dated August 29, 1996 and is by and among Memcor-Truohm Inc., an Indiana corporation ("Seller"), Ohmite Manufacturing Company, Inc., an Illinois corporation ("Purchaser"), A. Paul Harris ("Harris") and Jeffrey R. Crawford ("Crawford") (Harris and Crawford shall be collectively referred to as the "Shareholders") to purchase all of the Acquired Assets (as hereinafter defined) and assume certain liabilities of the business known as Memcor-Truohm, Inc. (the "Business")

## RECITALS

A.    Whereas Seller has engaged in the Business of developing, manufacturing, and marketing a variety of electrical and electronic products as set forth in Exhibit A (the "Products"); and

B.    Whereas Purchaser desires to purchase, and Seller desires to sell to Purchaser, the Acquired Assets (as hereinafter defined) on and subject to the terms and conditions contained in this agreement; and

C.    Whereas the Shareholders collectively own at least 81% of the Seller's outstanding shares; and

D.    Whereas Purchaser is a corporation incorporated under the laws of the State of Illinois.

## TERMS AND CONDITIONS

NOW THEREFORE, in consideration of the promises and other good and valuable consideration, and intending to be legally bound hereby, Purchaser, Seller and Shareholders hereby agree as follows:

**EXHIBIT**

**B**

# ARTICLE I

## PURCHASE AND SALE

1.1     Transaction:  On and subject to the terms and conditions of this Agreement at the Closing (as hereinafter defined), (a) Purchaser will purchase, acquire and accept from the Seller, and Seller will sell, convey, transfer, assign and deliver to Purchaser all of the Acquired Assets (as hereinafter defined); (b) Purchaser will assume sole responsibility for the payment and discharge all of the Assumed Liabilities (as hereinafter defined); and (c) Purchaser will pay to Seller the Purchase Price (as hereinafter defined).  Notwithstanding any other provision of this Agreement, Seller will retain (and Purchaser will not assume, pay or discharge) the Excluded Liabilities (as hereinafter defined).

1.2     Acquired Assets: "Acquired Assets" shall mean all assets, properties and rights of Seller as of the Closing which relate to the conduct of the Business, including without limitation those reflected on the Final Balance Sheet (as defined in ARTICLE II) of the Business and listed as follows:

(a)     All cash and cash equivalents as more specifically set on Schedule 1.2(a) hereto;

(b)     All prepayments and prepaid expenses as set forth on Schedule 1.2(b);

(c)     All trade notes and other accounts receivable that are less than 90 days old as more specifically set forth on Schedule 1.2(c) hereto;

(d)     All inventories including inventories of raw materials, work in process, finished goods, packaging materials and supplies as more specifically set forth on Schedule 1.2(d) hereto;

(e)     All real property consisting of the land, offices and manufacturing plant located at 1320 Flaxmill Road in Huntington, Indiana, and as more specifically described in the deeds of title, copies of which are attached hereto as part of Schedule 1.2(e);

(f)     All machinery, equipment tools, office furniture, fixtures, vehicles, and any and all other personal property used in the Business as more specifically set forth on Schedule 1.2(f) hereto;

(g)     All orders, contracts and commitments for the purchase of goods and/or services as set forth on Schedule 1.2(g);

(h)     All orders, contracts, commitments and proposals for the sale of the Products;

- 2 -

(i)    To the extent transferable under applicable law, all licensed permits, approvals, qualifications or the like issued or to be issued by any governmental authority relating to the Business;

(j)    All right, title and interest in and to the know-how and trade secrets and all other intellectual property rights which are or may be used or employed in the Business, including without limitation the trade names, trademarks, service marks, the goodwill associated with the trademarks, service marks and trade names, copy-rights, patents, applications therefore and registrations thereof, and license agreements associated therewith used in the Business and as specifically set forth on Schedule 1.2(j);

(k)    All records, files, software and other data associated with, used or employed by the Business; and

(l)    All other assets and rights of every kind and nature, real or personal, tangible or intangible of Seller utilized in the conduct of the Business or held for use in the Business or relating to the operation of the Acquired Assets, unless specifically excluded elsewhere herein.

1.3    Excluded Assets: The term "Excluded Assets" includes only the following potential rights, properties and assets of the Business as of the Closing:

(a)    Potential federal and state income tax refunds for any periods prior to the Closing;

(b)    Seller's rights under this Agreement and any other agreement between the Seller and Buyer after the date hereof;

(c)    Seller's rights to receive mail and other communications addressed to Memcor-Truohm, Inc. respecting Excluded Assets or Excluded Liabilities (as hereinafter defined) or from shareholders of Seller;

(d)    Seller's rights to claims, refunds, causes of action, and rights of recovery or set-off with respect to Domino, Inc., Excluded Assets, Excluded Liabilities, or rents in arrears (as of the Closing Date) from North American Power Supplies;

(e)    Seller's Articles of Incorporation, taxpayer and other identification numbers, minute books, stock transfer books, and other documents and rights of all kinds related or incidental to Seller's existence as a corporation.

1.4    Assumed Liabilities: The term "Assumed Liabilities" shall mean only the specified liabilities and obligations relating to the conduct of the Business which are set forth on Schedule

- 3 -

1.4(a) and are not Excluded Liabilities (as defined in Section 1.5), including but limited to the following:

> (a)    Trade notes and other accounts payable as more specifically set forth on Schedule 1.4(b) hereto;

> (b)    Seller's obligations under its outstanding note payable to the City of Huntington, Indiana, as shown on the Final Balance Sheet;

> (c)    Seller's obligations under contracts and commitments to be performed by their terms after the Closing and which (1) are described on Schedule 1.4(c) (or which are not required by the terms of this Agreement to be described thereon), or (2) have been entered into or incurred in the ordinary course of business;

> (d)    Seller's obligation to complete sales and purchase orders entered into in the ordinary course of Business to the extent unfilled as of the Closing Date;

> (e)    Capital lease obligations related to certain assets acquired as described in Schedule 1.4(d); and

> (f)    Termination pay to employees to the extent of the reserve included in the Preliminary Balance Sheet.

> 1.5    <u>Excluded Liabilities</u>: Purchaser shall not and does not assume, agree to pay, perform or discharge, indemnify Seller against, or otherwise have any responsibility for any liabilities or obligations of the Seller other than the Assumed Liabilities.  The following liabilities and all liabilities other than Assumed Liabilities shall remain the sole responsibility of Seller (the "Excluded Liabilities"):

> (a)    All Seller liability for or relating to any and all taxes of the Seller, including but not limited to taxes with respect to the Business or the premises or arising out of the consummation of this transaction (other than FICA and other withholding taxes reserved for on the Preliminary Balance Sheet).  To the extent that Purchaser pays any taxes on behalf of the Seller, Purchaser shall be entitled to reimbursement or have the right of offset against any payments due to Seller under this Agreement;

> (b)    All litigation, actions or proceedings now pending or threatened relating to the Business or the Acquired Assets;

> (c)    Any claims for personal injury or property damage alleging product liability relating to incidents prior to the Closing or products manufactured prior to the Closing even though <u>not</u> brought forth until after the Closing except for those specifically reserved for on the Preliminary Closing Balance Sheet;

- 4 -

(d)     All liabilities and costs, known or unknown, relating to or arising out of any agreement by Seller for the treatment, recycling, storage, or disposal at any facility owned or operated by another party or entity of a hazardous or toxic substance or hazardous or toxic waste, as those terms are defined by the federal or state law, generated by Seller at the facilities used in the conduct of the Business, or by any of its assets and shipped from Seller, or previously owned facilities prior to the Closing;

(e)     Any liability and costs, known or unknown, past or future, arising out of or relating to the release, discharge, or migration (including the movement of material through or in air, soil, surface water or ground water of any hazardous or toxic waste, as these terms are defined by federal or state law) from Seller or any previously owned facility prior to the Closing, including but not limited to any corrective actions necessary under sections of any act, law, ordinance, or regulation related to hazardous waste or hazardous constituents from any waste management units at any locations or any other related laws of any other duly constituted bodies;

(f)     Any obligations to employees or losses sustained by employees arising prior to the Closing Date, or obligations to or losses sustained by transferred employees of the Business under any insurance, medical or benefit programs, disability insurance; or other payment with respect to any transferred employee on either short term or long term disability, or occupational disease claims, or any other employee related claims for the above which have been filed before the Closing or any such claims or other claims related to employment by Seller prior to the Closing even though such claims may not arise until after the Closing; and

(g)     Any and all other liabilities or obligations, known or unknown, except those specifically defined to be Assumed Liabilities.

Seller agrees to promptly pay or discharge as applicable all of the Excluded Liabilities.

1.6     Purchase Price: For the sale, transfer, assignment and delivery of the Acquired Assets of the Business, Purchaser agrees to pay to Seller a Purchase Price of $3,855,000.  Purchase Price shall be paid as follows:

(a)  At the time of the signing of this document, the Purchaser shall deliver to the Seller a check in the amount of $100,000 as a refundable deposit on the Purchase Price.

(b)  At the Closing, the Purchaser shall deliver to the Seller:

(i)     a note in the amount of $600,000 payable upon the completion of the accounting review described in Section 2.1; and

(ii)     $3,155,000 in the form of a cashiers check at Closing.

- 5 -

## ARTICLE II

### FINAL ADJUSTMENT: ALLOCATION

2.1  Final Adjustment.  As soon as practicable following the Closing Date, the Purchaser's accountants shall prepare a balance sheet in accordance with generally accepted accounting principles as of the Closing Date ("the Final Balance Sheet").  If the amount of the Acquired Assets shown on the Final Balance Sheet less the amount of the Assumed Liabilities on the Final Balance Sheet is equal to $3,255,000, a final payment by certified check in the amount of $600,000 shall be paid to the Seller within 30 days after completion of the Final Balance Sheet in complete satisfaction of the note described in Section 1.6(b)(i).  If the amount of the Acquired Assets shown on the Final Balance Sheet less the amount of the Assumed Liabilities shown on the Final Balance Sheet is less than (or greater than) $3,255,000, the amount paid by the Purchaser pursuant to this Section 2.1 shall be $600,000 reduced (or increased) by the amount of such difference, and such payment shall be in complete satisfaction of the note described in Section 1.6(b)(i).  For purposes of this Section 2.1, only the accounts receivable that are less than 90 days old as of the Closing Date shall be taken into account.

2.2  Allocation.  The parties shall agree to the allocation of the Purchase Price and the Assumed Liabilities among the Acquired Assets as soon as practicable following the Closing and shall act (and report) at all times in a manner that is consistent with such allocation.

## ARTICLE III

### REPRESENTATIONS AND WARRANTIES BY SELLER AND SHAREHOLDERS

As a material inducement to the Purchaser to enter into this Agreement and to enter into all other agreements and documents executed by the Purchaser in connection with this Agreement and to consummate the transactions contemplated hereby, the Seller and the Shareholders jointly and severally represent and warrant to the Purchaser as follows:

Organization, Existence and Authority of Seller  The Seller and the Shareholders have the full capacity, right, power, and authority to enter into, execute, and deliver this Agreement, to consummate the transactions contemplated by this Agreement, and to comply with and fulfill the terms and conditions of this Agreement.  The Seller and the Shareholders have the full capacity, right, power, and authority to sell, transfer, assign, and deliver all of the Acquired Assets to the Purchaser. Seller is a corporation incorporated and validly existing under the laws of the State of Indiana, for which the most recent required annual report under the Indiana Business Corporation Law has been filed with the Indiana Secretary of State and for which no Articles of Dissolution appear as filed with the Indiana Secretary of State's Records.  Seller is duly qualified to do business in Indiana and other states and jurisdictions where the nature of the Business requires qualification.  The execution and delivery of this Agreement by Seller and the Shareholders do not, and the consummation of the transactions contemplated hereby will not, violate any provisions of or result in the acceleration of

-6-

any obligation under such Seller's Articles of Incorporation, By-Laws or any provision of any indebtedness mortgage, lien, lease, agreement, instrument, order, arbitration award, judgment or decree to which the Seller or any Shareholder is a party or by which it is bound, which violation would have a materially adverse affect on the Seller's or the Shareholders' ability to consummate the transactions contemplated hereby. The execution, delivery and performance of this Agreement by Seller and the Shareholders have been duly authorized by all requisite corporate actions. This Agreement is a valid and binding agreement of Seller and the Shareholders, enforceable in accordance with its terms and conditions, subject to applicable bankruptcy, insolvency, reorganization, and other similar laws of general applicability relating to or affecting creditors rights generally. No further action is necessary by the Seller or the Shareholders to make this Agreement valid and binding upon it or them and enforceable against it or them in accordance with the terms hereof or to carry out the transactions contemplated hereby.

3.2. Title to Property. Except as set forth in Schedule 3.2, the Seller has good, valid and marketable title to all of its respective properties, interests in properties and assets (other than those held by lease), real or personal, tangible or intangible, that are used in the Business, free and clear of all mortgages, liens, pledges, charges, claims, security interests, encumbrances, easements, encroachments, rights of third parties, or other interests of any kind or character, and except for liens for property taxes not yet due and payable. Without limiting the foregoing, except as set forth on Schedule 3.2, the Acquired Assets are held by the Seller free and clear of any and all mortgages, liens, pledges, charges, claims, security interests, encumbrances, easements, encroachments, rights of third parties, or other interests of any kind or character.

3.3 Real Property. Schedule 1.2(e) contains a list of the real property that will be acquired by the Purchaser pursuant to Section 1.1 including all buildings, structures and improvements located thereon, fixtures contained therein, and appurtenances attached thereto (the "Real Property"). Except as set forth in Schedule 3.3, (a) the Real Property conforms in all material respects to all applicable federal, state, county, and local laws, regulations, and ordinances, including without limitation those related to zoning, use, or construction, (b) the Real Property is zoned for the purposes for which it presently is used, and (c) the Seller is not a party to any lease under which the Seller is a lessee or lessor of real property.

3.4 Equipment. Schedule 1.2(f) attached hereto lists all items of equipment and personal property owned or held pursuant to capitalized leases by the Business as of Closing and which have a value of in excess of $1,000.

3.5 Trademarks, Patents, Etc. Schedule 1.2(j) sets forth a list and description of trademarks, service marks, unexpired patents, registered copyrights, royalty rights, applications therefore and registrations thereof, license agreements and all other intellectual property of Seller which are used in the Business. These assets, together with all know-how and intangible property utilized by the Business which is not listed on Schedule 1.2(j), comprise the "Intellectual Property Rights". Any and all such Intellectual Property Rights, listed or not, are the sole and exclusive property of Seller, and Seller has the sole and exclusive right (except to the extent indicated therein) to the use thereof.

- 7 -

Except as indicated in Schedule 3.5:

(a)   No proceedings have been instituted or are pending or, to the knowledge of Seller, threatened which challenge the rights of Seller in respect of the Intellectual Property Rights, and none is subject to any outstanding order, decree, judgment, stipulation, injunction, restriction or agreement restricting the scope of the use by Seller and, consequently, the Purchaser;

(b)   Seller has the right to make the sales, assignments and transfers of the Intellectual Property Rights provided for herein;

(c)   To Seller's knowledge, no claim or assertion has been made that the manufacture, use or sale of the inventions described in the patents listed in Schedule 1.2(j) infringe or would infringe any rights of any third party;

(d)   To Seller's knowledge, no claim or assertion has been made that the use of the Intellectual Property Rights in connection with the Business being transferred to the Purchaser infringe or would infringe any patent or trademark rights of a third party;

(e)   To Seller's knowledge, no unlicensed third party is infringing any of the Intellectual Property Rights;

(f)   To Seller's knowledge, no claims or assertions have been made to it concerning any alleged invalidity and/or unenforceability of the Intellectual Property Rights; and

(g)   The Seller has taken all necessary steps to protect and preserve all rights related to Intellectual Property.

3.6  Litigation; Pending Labor Disputes.  Except as disclosed in Schedule 3.6 attached hereto:

(a)  There are no private or governmental actions, claims, investigations, or proceedings against Seller relating to the Business pending or, to the knowledge of Seller, threatened nor are there any judgments, decrees or orders binding upon Seller enjoining Seller in respect of, or the effect of which is to prohibit, any business practice which is material to the Business;

(b)  No work stoppage, labor dispute, strike or similar event which could materially adversely affect the results or operations of the Business has occurred and is continuing or, to the knowledge of Seller, is threatened;

(c)  There is no unfair labor practice, complaint, labor disturbance or other controversy respecting employment pending or threatened against Seller with respect to the Business;

- 8 -

(d)  Schedule 3.6(d) sets forth a list of all employees of the Seller employed in the Business, together with their salaries or rate of pay.  Other than (i) agreements to employ such individuals at the salaries and rates stated in Schedule 3.6(d), which agreements do not contain any express provisions barring termination upon notice by Seller, (ii) collective bargaining agreements listed in Schedule 3.6(e), and (iii) employee benefit plans, policies, programs and practices listed in Schedule 3.13, Seller is not a party to or otherwise bound by any contracts, agreements or other commitments respecting employment or compensation of any of its officers, directors, employees or agents engaged solely in activities related to the Business.  Other than as described in the Schedule 3.6(e), the Seller is not a party to any collective bargaining agreement with any labor union or organization covering employees of the Business, and none of the employees employed in the Business is represented by any labor union or organization in connection with employment in the Business, except that which is listed in Schedule 3.6(e);

(e)  There are no charges of unfair labor practices pending or, to the knowledge of Seller, threatened before any governmental or regulatory agency or authority; and

(f)  The Business has materially complied with all laws, ordinances and regulations relating to the employment of labor, including any provisions thereof relating to wages, hours, collective bargaining and the payment of social security and similar taxes, and is not liable for any arrears of wages or any taxes or penalties for failure to comply with any of the foregoing.

3.7  Contracts.  The schedules attached to this Agreement set forth a complete and accurate list of the following written contracts, agreements or understandings (other than real estate leases), to which Seller is a party which relate predominantly to or predominantly affect the Business or by which any of the Acquired Assets or any Purchasers thereof may be bound:

(a)  All union agreements, and all written employment contracts, which are not terminable on thirty (30) days notice or less without penalty or legal obligation to make payments after the expiration of such thirty (30) day period;

(b)  All contracts or commitments for capital expenditures or the acquisition of fixed assets;

(c)  All contracts relating to the rental or use of equipment, other personal property or fixtures by the Business;

(d)  All contracts relating in any way to indebtedness for borrowed money or evidenced by a bond, debenture, note or other evidence of indebtedness (whether secured or unsecured) of or to Seller relating specifically to the Business, except indebtedness incurred by way of lease or purchase money security interest entered into in the ordinary course of the business of the Business or indebtedness involving not more than $1,000 in the aggregate to any one creditor;

- 9 -

(e)  To the extent applicable to the Business, all contracts materially limiting the freedom of Seller to engage in or to compete in any line of business or with any person or in any area or to use or disclose any information in its possession;

(f)  All contracts or agreements for the purchase of any materials or supplies or services, except individual purchases extending not more than ninety (90) days from the date hereof or involving not more than $1,000 each or incurred in the ordinary course of business; and

(g)  Any contract or agreement for the sale of products or furnishing of or services, except contracts made in the ordinary course of business and involving less than $1,000 each.

Except as set forth in Schedule 3.7, all such contracts or agreements are valid and binding obligations of Seller, are enforceable in accordance with their respective terms, are in full force and effect (although certain such contracts and agreements may not be assignable or transfer without the consent of the other party thereto) and will continue in full force and effect without the consent of any other party so that, after the Closing, the Purchaser will be entitled to the full benefits thereof. Except as set forth in Schedule 3.7, none of the contracts contains any provisions that are triggered by a change in control or sale of substantially all of the assets of the Seller or by any of the transactions contemplated by this Agreement.  No party thereto, to the knowledge of Seller, is in default in any material respect under the terms thereof.

3.8  Inventory.  All of the inventory is in usable, good, marketable condition and free from defects.

3.9  Condition of Assets.  Except for routine maintenance activities, to the best of Seller's knowledge, all Real Property and major items of machinery and equipment currently being used to produce the Products of the Business and included within the "Acquired Assets" are generally in good operating condition consistent with their age and usage, reasonable wear and tear excluded.

3.10  Financial Statements.  Attached hereto as Schedule 3.10 are the following documents (collectively, Seller's "Financial Statements"): (a) Seller's June balance sheet dated July 23, 1996 ("Preliminary Balance Sheet"), (b) Seller's June statement of income dated July 23, 1996, (c) a list of Seller's property plant and equipment at June 23, 1996, and (d) Seller's reviewed financial statements for the years 1993, 1994, and 1995. The Preliminary Balance Sheet was prepared in accordance with generally accepted accounting principles applied on a consistent basis, and presents fairly the financial position of the Business on a stand-alone basis as of the date indicated.  Except as disclosed in the Preliminary Balance Sheet and except to the extent not required to be disclosed in the Preliminary Balance Sheet or pursuant to this Agreement, to the knowledge of Seller, the Business has no liabilities or obligations of any kind requiring the Business to make payments in excess of an aggregate amount of $5,000 with respect to all such liabilities and obligations, whether accrued, absolute, contingent or otherwise.

- 10 -

3.11  Absence of Certain Change or Events.  Since June 30, 1996, the Business has been conducted only in the ordinary course and except as set forth in Schedule 3.11, the Business or Seller with respect to the Business has not, without the prior approval of Purchaser:

(a)  Incurred any obligation or liability, or entered into any commitment in excess of $1,000 except normal trade or business obligations incurred in the ordinary course of business;

(b)  Discharged or satisfied any encumbrances or paid any obligation or liability, other than in the ordinary course of business;

(c)  Mortgaged, pledged or subjected to lien, charge, security interest or to any other encumbrances any of its assets or properties, other than in the ordinary course of business;

(d)  Transferred, leased or otherwise disposed of or agreed to transfer, lease or otherwise dispose of, any of its capital assets, or acquired any assets or properties, except in arms length transaction for a fair consideration in the ordinary course of business;

(e)  Canceled or compromised any debt or claim other than in the ordinary course of business;

(f)  Waived or released any rights of value, or modified any agreement reflected on any schedule to this Agreement other than in the ordinary course of business;

(g)  Transferred or granted any rights under any leases, licenses, agreements, patents, inventions, trademarks, trade names, service marks, brand names or copyrights or with respect to any know-how or any other Intellectual Property Right;

(h)  Entered into any other transaction, contract or commitment except this Agreement and the transactions contemplated hereby and other than in the ordinary course of business;

(i)  Made any capital expenditures or entered into any commitment therefor exceeding $5,000 in any one instance;

(j)  Introduced any material changes with respect to the operation of the Business;

(k)  Made any increase in or commitment to increase any employee benefits or adopted or made any commitment to adopt any additional employee benefit plan;

(l)  Suffered any casualty loss or damage (whether or not covered by insurance) which affects the ability of the Seller to conduct its business; or

(m)  Suffered any adverse material change in its financial condition or results of operations or in its assets, properties, business or operations.

- 11 -

3.12  Environmental Matters.

(a)    Except as disclosed in Schedule 3.12, Seller warrants that to the best of its knowledge it has all federal, state and local environmental permits or authorizations required in connection with the operation of the Business.  As soon as practicable after Closing, the Purchaser shall use its best efforts to obtain and substitute its local, state, and federal environmental permits for Seller's permits, and to assume the ongoing process of timely reapplication and renewal of such permits and use its best efforts to complete such reapplication, negotiations, modifications and performance verifications of such permits as are in process at the time of the Closing Date.  Seller shall cooperate with the Purchaser in connection with these permit renewal transfers (in those instances where transfers are permitted) in all reasonable respects.

(b)    Seller has fully and accurately completed and delivered to Purchaser the Environmental Disclosure Questionnaire, which is attached hereto as Schedule 3.12(a).

(c)    Seller has fully complied with all applicable environmental, federal, state, local and other jurisdictional laws and regulations in the operation of the Business, including but not limited to RCRA and Indiana state environmental agency regulations, and except as set forth on Schedule 3.12(c), Seller is not aware of any act, circumstance, or condition which would give rise to any potential remedial or other legal action under such environmental laws and regulations, and Seller has not received any notice of warning of such non-compliance thereunder.

3.13  Employee Benefits.  All Employee Plans are listed in the Schedule 3.13.  For purposes of this Agreement, the term "Employee Plan" includes any pension, retirement, savings, disability, sickness, leave of absence, fringe benefit, educational assistance reimbursement, employee discounts, equity participation, excess benefit, child or dependent care, flexible benefit, medical, dental or other health plan, life insurance or other death benefit plan, profit sharing, deferred compensation, stock option, bonus or other incentive plan, vacation benefit plan, severance plan, or other employee benefit plan or arrangement including, but not limited to, any pension plan ("Pension Plan") as defined in Section 3(2) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), and any welfare plan as defined in Section 3(1) of ERISA ("Welfare Plan"), whether or not any of the foregoing is funded, and whether written or oral, which is maintained or administered by Seller, to which the Seller contributes to or is obligated to contribute or under which Seller has a liability with respect to current or former employees or to which Seller had any such obligations within the three year period before the Closing.

To the best of its knowledge, Seller represents that:

(a)    As of the Closing Date, the fair market value (determined in accordance with the Code and ERISA) of the assets (excluding for this purpose any accrued but unpaid contributions) of each Pension Plan, that is a defined benefit plan as defined in ERISA Section 3(35) that is not a multiemployer plan as defined in ERISA Section 3(37), exceed the present value of all benefits accrued under each such Pension Plan determined on a termination basis using the assumptions

- 12 -

established by the Pension Benefit Guaranty Corporation ("PBGC") as in effect on such date. With respect to each Pension Plan, the funding method used in connection with such Pension Plan has at all times satisfied and will as of the Closing Date satisfy any and all requirements under ERISA or the Code. There is as of the date hereof no "accumulated funding deficiency" as defined in ERISA Section 302(a)(2) Code Section 412(a) (whether or not waived) which exists, asserted or unasserted, with respect to any plan year of any Pension Plan. There are no premiums due to the Pension Benefit Guaranty Corporation ("PBGC") for any Pension Plan.

(b)     No Pension Plan has ever acquired or held any "employer security" or "employer real property" each as defined in Section 407(d) of ERISA and any such acquisition or holding, as so set forth, has at all times been in compliance with ERISA, the Code and all other applicable laws, rules and regulations.

(c) Each Employee Plan, the administrator and fiduciaries of each Employee Plan and Seller have at all times complied in all respects with the applicable requirements of ERISA, the Internal Revenue Code of 1986, as amended ("Code"), and any other applicable law (including all regulations and rulings thereunder) governing each Employee Plan, and each Employee Plan has at all times been properly administered in accordance with its terms and the requirements of the Code and ERISA. No action, proceeding, investigation, audit, lawsuit, claim for benefits, arbitration or complaints to or by any person or governmental entity have been filed or are pending and Seller has no knowledge of any state of facts or contemplated event which is reasonably expected by it to give rise to any such lawsuit or complaint with respect to any Employee Plan. There are no liabilities, contingent or otherwise, accrued or unaccrued, asserted or unasserted, with respect to any Employee Plan. Seller is not now, nor has it ever been, a "substantial employer" under Section 4063 of ERISA with respect to any multi-employer plan. Seller has not been a party to or liable for any withdrawal liability with respect to any multi-employer plan with respect to any employees employed in the Business;

(d) Each Pension Plan has at all times qualified under Section 401(a) of the Code and has been tax exempt under Section 501(a) of the Code, and currently has a favorable determination letter as to the qualified status of the Pension Plan as amended through the date set forth in Schedule 3.13; and no reportable events (as defined in ERISA Section 4043) and no event (as defined in ERISA Section 4041, 4042, 4062, 4063 or 4064) has occurred in connection with any Pension Plan;

(e) With respect to each Employee Plan, no prohibited transaction has occurred giving rise to tax under Section 4975 of the Code or Section 406 of ERISA, or liability under Section 502(i) of ERISA;

(f) With respect to "qualified beneficiaries", Seller has in all material respects complied with the requirement of the Consolidated Omnibus Budget Reconciliation Action of 1985 with respect to the continuation of employer-provided health benefits following a "qualifying event" which would otherwise terminate such benefits, as provided in Section 4980B of the Code and applicable regulations and IRS rulings, notices and other pronouncements;

- 13 -

4.3     **Full Disclosure**.  No representation or warranty of the Purchaser made in this Agreement contains or will contain any untrue statement of a material fact or omits or will omit to state a material fact necessary to make the statements or facts contained herein not misleading.

## ARTICLE V

## COVENANTS OF SELLER AND SHAREHOLDERS

Seller and the Shareholders covenant and agree with the Purchaser as set forth below:

5.1     **Conduct of Business**.  Seller will, and the Shareholders will cause Seller to, conduct the Business in the ordinary course (including, without limitation, using its best efforts to preserve beneficial relationships between the Business and its employees, lessors, suppliers and customers) and will continue normal marketing, advertising, capital and promotional expenditures during the period from the date hereof until the Closing Date except as may be permitted hereby or as otherwise agreed to in writing by Purchaser. Credit and payment terms for the sale of goods will continue to be made generally on these same terms and conditions as in the past.

5.2     **No Encumbrances**.  Prior to the Closing Date, Seller will not, and the Shareholders will not permit Seller to, create or cause to exist any encumbrances on any of the Acquired Assets or enter into any transaction or make any commitment relating to any transaction or make any commitment relating to any of the Acquired Assets otherwise than in the ordinary course of Business, except as may be permitted hereby or with the written consent of Purchaser.

5.3     **Supplying of Information**.  Prior to Closing, Seller shall, and the Shareholders will cause Seller to, furnish to the Purchaser or its representatives such complete and accurate information as the Purchaser may reasonably request in cooperation with any audit, review, investigation or examination of the books and records, accounts, contracts, properties, assets, operation and facilities of the Business.

5.4     **Notices and Approvals**.  Seller agrees to give all notices to third parties and use its best efforts to obtain all consents, approvals, permits and authorizations which may be necessary in connection with or to consummate the transactions contemplated by this Agreement. Purchaser agrees to cooperate as reasonably requested by Seller.

5.5     **Books and Records**.  At all reasonable times after Closing, Seller shall make available without cost for inspection or copying by the Purchaser any of Seller's books and records relating primarily to the Business which are not to be transferred to the Purchaser pursuant to Section 1.2(k); and the Purchaser shall make available without cost for inspection or copying by Seller any of Seller's books and records which may be transferred to the Purchaser hereunder; provided, however, that any such inspection or copying shall be conducted in such a manner as not to interfere with the normal conduct of business. Any of Seller's books and records delivered to Purchaser hereunder shall be preserved by the Purchaser for a period of at least four (4) years from the Closing.

- 15 -

5.6     Additional Agreements.

(a)     Seller at the request of the Purchaser at or after the Closing and without further consideration will promptly execute and deliver, or cause to be executed and delivered, to the Purchaser such assignments, bills of sale, consents and other such instruments in addition to those otherwise required by this Agreement, in form and substance reasonably satisfactory to the Purchaser, as the Purchaser may reasonably deem necessary or desirable to carry out or implement any term of this Agreement; and

(b)     To the extent that any of the claims, contracts, licenses, leases, commitments, sales orders or purchase orders for which assignment to the Purchaser is provided herein are not assignable without the consent of another party, this Agreement shall not constitute an assignment or an attempted assignment thereof if such assignment or attempted assignment would constitute a breach thereof. If any such consent shall not be obtained by the Closing, Seller agrees to cooperate with the Purchaser in any reasonable arrangement designed to provide for the Purchaser the benefits under any such claim, contract, license, lease, commitment, sales order or purchase order, including purchasing under outstanding purchase orders and reselling to the Purchaser at invoice price, without any charge for such service. Seller hereby authorizes the Purchaser, at the Purchaser's expense, to perform all of such party's obligations after the Closing pursuant to any such claim, contract, license, lease, commitment, sales order or purchase order; Seller agrees to remit promptly to the Purchaser all such collections received by them in respect of the Business.

5.7     Indemnity for Environmental Liabilities.     After the Closing, Seller and the Shareholders shall defend, indemnify and save the Purchaser from any liability and costs, known or unknown, past or future, arising out of or relating to the release, discharge or migration (including the movements of material through or in air, soil, surface, water, or groundwater) of any hazardous or toxic substance or hazardous or toxic waste, as these terms are defined by federal or state law, or from the facilities prior to the Closing, including but not limited to any corrective actions necessary under Sections 3004(u), 3004(v), and 3004(h) of the Resource Conservation and Recovery Act or any action undertaken under any other environmental law to address a release of a hazardous waste or hazardous constituent from a solid waste management unit located at its facilities or elsewhere.

5.8     Restrictive Covenant. Seller and the Shareholders agree that, for a period of five (5) years from the Closing Date, neither they nor any affiliates or related parties of either will (a) directly or indirectly manufacture or market products which are competitive with respect to the Products, or (b) license any additional person, firm, association, syndicate, company or corporation to use the Intellectual Property Rights to make such products, or (c) solicit customers of the Business as of the Closing Date to purchase such products, or (d) hire employees of Purchaser.

- 16 -

## ARTICLE VI

## COVENANTS OF THE PURCHASER

The Purchaser covenants and agrees with Seller as set forth below:

6.1    Confidentiality. In the event of termination of this Agreement, the Purchaser will use all reasonable efforts to cause to be delivered to Seller, and will retain no copies of, any and all documents, work papers and other material obtained by the Purchaser from Seller, whether so obtained before or after the execution hereof, and neither the Purchaser nor any affiliate thereof will itself use or intentionally disclose, directly or indirectly, any information so obtained or otherwise obtained from Seller hereunder or in connection herewith and will use all reasonable efforts to have all such information kept confidential and not used in any way detrimental to Seller; provided, however, that (a) the Purchaser may use and disclose any such information which has been publicly disclosed (other than by the Purchaser or any affiliate thereof in breach of its obligations under this Section 6.1) or has rightfully come into the possession of the Purchaser or any affiliate thereof (other than from Seller), and (b) to the extent that the Purchaser or any affiliate thereof may become legally compelled to disclose any of such information, the Purchaser or such affiliate may disclose such information if it has used all reasonable efforts, and has afforded Seller the opportunity, to obtain an appropriate protective order or other satisfactory assurance of confidential treatment, for the information required to be so disclosed.

## ARTICLE VII

## CONDITIONS

7.1    Conditions to Purchaser's Obligations: The obligation of Purchaser to consummate the transactions contemplated by this Agreement is subject to the satisfaction of the following conditions at or before the Closing:

(a)    The representations and warranties of Seller contained in this Agreement shall be true, accurate and complete in all respects as of the date hereof and as of the Closing;

(b)    Seller shall have performed and complied with all agreements and conditions required by this Agreement to be performed or satisfied by it;

(c)    All corporate and other proceedings or actions to be taken by Seller in connection with the transactions contemplated by this Agreement, and all documents incidental thereto, shall be satisfactory in form and substance to Purchaser;

(d)    There shall not have been issued or in effect any injunction or similar legal order prohibiting or restraining consummation of any of the transactions herein contemplated

- 17 -

and no legal action or governmental investigation which might reasonably be expected to result in any such injunction or order shall be pending;

(e)     Purchaser's lenders shall have consented to the execution of this Agreement by Purchaser and the consummation of the transactions contemplated thereby;

(f)     Purchaser shall have obtained binding financing commitment from an acceptable lender for the transaction contemplated hereunder upon terms and conditions acceptable to Purchaser not later than September 16, 1996;

(g)     Seller shall have complied with the provisions of the Bulk Sales Laws of Indiana or similar statutes and Purchaser shall have received reasonable assurance that the transaction and transfer of the Acquired Assets will not constitute a potential preference under the U. S. Bankruptcy Code or other insolvency laws;

(h)     The Environmental Questionnaire and disclosure referred to in Section 3.12 and (at Purchaser's option) a Phase I environmental assessment report with respect to Seller's business, shall not have revealed any current or potential material liabilities which could impact either the Purchaser or its lender(s);

(i)     There has been no material adverse change in the Business or its future prospects since the date of this Agreement;

(j)     Purchaser shall have received all necessary permits, licenses, and authorizations to operate the Business;

(k)     The Purchaser, in its sole discretion, shall be satisfied with the results of its due diligence regarding the Acquired Assets, the Assumed Liabilities, and the Business, including, but not limited to, the information set forth on the schedules to this Agreement.

(l)     Prior to the Closing, Seller shall have furnished the Purchaser, at the Seller's expense, a commitment for an owner's policy of title insurance, satisfactory to the Purchaser, in its sole and absolute discretion, issued by a nationally reputable title insurance company (the "Title Company"), and containing the agreement of the Title Company to insure fee simple title to the Real Property in the name of the Purchaser upon delivery of a general warranty deed from the Seller to the Purchaser.

(m)     Prior to the Closing, the Seller, at the Seller's expense, shall have furnished to Purchaser a boundary survey of the Real Property, satisfactory to the Purchaser in its sole and absolute discretion.

(n)     The Purchaser shall have received the opinion, dated the Closing Date, of Matheny, Michael, Hahn & Bailey, counsel to the Seller, to the effect that (i) Seller is a

- 18 -

corporation incorporated and validly existing under the laws of the State of Indiana, (ii) execution and delivery of this Agreement and the consummation of the transactions contemplated by such agreements do not violate the terms of the Seller's Articles of Incorporation or By-laws, (iii) the execution and delivery of this Agreement by the Seller do not require the consent or approval of any governmental authority or other third party, except such consents and approvals which have been obtained prior to the Closing, (iv) the Agreement has been duly authorized by all corporate action by the Seller and has been duly executed and delivered by the Seller and is enforceable against Seller in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, and other similar laws of general applicability relating to or affecting creditors rights generally, (v) to the knowledge of such counsel there is no claim or lawsuit pending or threatened which would challenge or prevent the consummation of the transactions contemplated by the Agreement, (vi) the conveyance documents executed by the Seller and/or Shareholders transfer the Seller's title to the Acquired Assets to the Purchaser, and (vii) Shareholders collectively own at least 81% of the Seller's outstanding shares.

(o)     Purchaser shall have received at Closing all of the deliveries of Seller set forth in Section 8.4.

(p)     Purchaser shall have received all completed exhibits and schedules to this Agreement on or before September 16, 1996, and such exhibits and schedules shall be satisfactory to the Purchaser in form and substance in its sole and absolute discretion.

7.2     Conditions to Seller's Obligations: The obligation of Seller to consummate the transactions contemplated by this Agreement is subject to the satisfaction of the following conditions at or before the Closing:

(a)     The representations and warranties of Purchaser contained in this Agreement shall be true, accurate and complete in all material respects as of the date hereof and as of the Closing;

(b)     Purchaser shall have performed and complied with all agreements and conditions required by this Agreement to be performed or satisfied by it;

(c)     Purchaser shall have taken all corporate and other proceedings to be taken by it in connection with the transactions contemplated by this Agreement;

(d)     All requisite governmental approvals and authorizations necessary for consummation of the transaction contemplated hereby shall have the duly issued or granted;

(e)     There shall not have been issued or in effect any injunction or similar legal order prohibiting or restraining consummation of any of the transactions herein contemplated

- 19 -

and no legal action or governmental investigation which might reasonably be expected to result in any such injunction or order shall be pending;

      **(f)**    The Purchaser shall have obtained the consent of its lenders to Purchaser's execution of this Agreement and the consummation of the transaction contemplated thereby;

      **(g)**    The Seller shall have received the opinion, dated the Closing Date, of Ice Miller Donadio & Ryan, counsel to the Purchaser, to the effect that (i) the execution and delivery of this Agreement by the Purchaser does not require the consent or approval of any governmental authority or other third party, except such consents and approvals which have been obtained prior to the Closing, (ii) the Agreement has been duly authorized by all corporate action by the Purchaser and has been duly executed and delivered by the Purchaser and is enforceable against Purchaser in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, and other similar laws of general applicability relating to or affecting creditors rights generally, and (iii) to the knowledge of such counsel there is no claim or lawsuit pending or threatened which would challenge or prevent the consummation of the transactions contemplated by the Agreement; and

      **(h)**    The Seller shall have received at the Closing all of the deliveries of the Purchaser set forth in Section 8.3

    7.3    <u>Parties' Best Efforts</u>.  From the date hereof to the Closing, the parties will cooperate and use their respective best efforts to cause the conditions set forth in this Article VII to be satisfied on or before the Closing Date.

**ARTICLE VIII**

<u>CLOSING</u>

    8.1    <u>The Closing</u>.  For purposes hereof, the term "Closing" means the time at which the transactions contemplated hereby will be consummated after satisfaction or waiver of the conditions set forth in Article VIII of this Agreement.

    8.2    <u>Time, Date, and Place of Closing</u>.  The closing will occur as of 12:01 a.m. on such date as the parties may agree ("Closing Date"), but in no event later than October 18, 1996.  The Closing will take place at the offices of American National Bank and Trust Company, Chicago, Illinois or at such other place as the parties may agree in writing.

    8.3    <u>Purchaser's Obligations</u>.  At the Closing, Purchaser will deliver to Seller the following:

      **(a)**    The amount and note specified in Section 1.6 hereof;

- 20 -

(b)     An assumption of the Assumed Liabilities and such other instruments of assumption as the Seller reasonably may request;

(c)     An Opinion of Ice Miller Donadio & Ryan, Counsel to Purchaser, as described in Section 7.2(g); and

(d)     A certificate dated as of the Closing executed by an officer of Purchaser acknowledging (or waiving) satisfaction of the conditions set forth in Section 7.1 and the delivery by Seller of the items set forth in Section 8.4.

8.4     Seller's Obligations.  At Closing, Seller will deliver to Purchaser the following:

(a)     An executed and notarized bill of sale and such other necessary or desirable instruments of sale, transfer, conveyance and assignment for the Acquired Assets (including, but not limited to, third party consents) in form and substance satisfactory to Purchaser;

(b)     An Opinion of Matheny, Michael, Hahn & Bailey, Counsel to the Seller, as described in Section 7.1(n);

(c)     A Certificate of Existence of the Seller issued by the Secretary of State for the State of Indiana, dated as of the most recent practicable date prior to the Closing;

(d)     Results of searches dated within 10 days of the Closing disclosing any judgments, tax liens, Uniform Commercial Code financing statements, or any other liens filed or indexed against any of the Acquired Assets;

(e)     All permits necessary to conduct the Business, transferred to the Purchaser as required by law;

(f)     All documents necessary to perfect title to or interest in any of the Acquired Assets, including, but not limited to, a warranty deed and any other document necessary to convey good and marketable title to the Real Property; and

(g)     A Certificate dated as of the Closing executed by the President of Seller acknowledging (or waiving) satisfaction of the conditions set forth in Section 7.2 and delivery by Purchaser of the items set forth in Section 8.3;

- 21 -

## ARTICLE IX

### ACTIONS AFTER CLOSING

9.1     Further Conveyances.  After the Closing, Seller will without further cost or expense to Purchaser execute and deliver to Purchaser (or cause to be executed and delivered to Purchaser), such additional instruments of conveyance and Seller shall take such other and further actions as Purchaser may reasonably request and which are ordinarily provided by a Seller, more completely to sell, transfer, and assign to purchaser and vest in Purchaser ownership to the Acquired Assets.  At Purchaser's expense, Seller shall file or cooperate with Purchaser in the filing of the appropriate notices of all assignments in the U.S. and foreign Patent and Trademark office.  All such notices shall be prepared by Purchaser.

## ARTICLE X

### EMPLOYEES AND EMPLOYEE BENEFITS

10.1     Employment.  Except as otherwise noted herein, each employee employed by Seller in the Business will cease to be an employee of Seller.  Except as specifically provided in this Article X, Purchaser shall not be obligated to offer employment to all of Seller's employees or provide to any transferred employees any specific benefits or other terms of employment.  Purchaser shall assume no obligation in respect of termination of employees of the Business resulting from the Purchasers' failure to hire such employees, including without limitation any obligation to provide severance payment and any obligation to provide continuation of employer provided health benefits pursuant to Section 390B of the Code or COBRA.

10.2     Employee Benefit Package.  With respect to the transferred employees at Closing, such non-union employee shall be eligible to participate in one of the Purchaser's group health plans and Profit Sharing 401(k) Plan according to the terms thereunder applicable to newly hired non-union employees adjusted for Indiana operating conditions.

10.3     Vacation.  At such time a transferred employee ceases to be employed by Seller, Seller will pay each such employee for any accrued vacation pay and/or sick pay entitlement.

## ARTICLE XI

### CUSTOMERS AND SUPPLIERS

11.1     Customers.  Seller and Purchaser will make confidential joint customer calls to key customers and suppliers of the Business to provide appropriate assurance of continuity of supply and services.  Both Seller and Purchaser agree to use their best efforts to minimize the disruption of supply and services to the customers and from the suppliers of the businesses that could result from this transaction.

- 22 -

## ARTICLE XII

## AMENDMENT AND WAIVER

12.1     <u>Amendment</u>.  This Agreement may be amended at any time prior to the Closing, but only by written instrument executed by both parties hereto.

12.2     <u>Waiver</u>.  Either party may at any time waive compliance by the other with any covenants or conditions contained in this Agreement.  No such waiver, however, shall be deemed to constitute the waiver of any such covenant or condition in any other circumstance or the waiver of any other covenant or condition.

## ARTICLE XIII

## SURVIVAL; INDEMNIFICATION

13.1     <u>Survival; Remedy for Breach</u>.  The representations or warranties of the parties hereto contained hereto or in any schedule attached or certificate delivered pursuant hereto or in connection herewith shall survive the Closing indefinitely.  After the Closing, the sole and exclusive remedy of the Purchaser for any breach or inaccuracy of any representation or warranty by Seller shall be the indemnities contained in Section 13.2, which indemnities shall survive the Closing indefinitely.  After the Closing, the remedies available to Seller for any breach or inaccuracy of any representation or warranty by the Purchaser, shall be the indemnities contained in Section 13.3 which shall survive the Closing indefinitely.

13.2     <u>Indemnification by Seller and Shareholders</u>.

(a)     Seller and Shareholders hereby jointly and severally indemnify the Purchaser against, and agree to hold it harmless from, any and all damage, loss, liability, deficiency, cost or expense (including without limitation reasonable expense of investigation and attorneys' fees and expense in connection with any action, suit or proceedings brought against the Purchaser but excluding any consequential or punitive damages in excess of actual damages sustained and excluding any loss that is covered by insurance) incurred or suffered by the Purchaser arising out of or resulting from (i) any misrepresentation by or breach of any representation, warranty, covenant, term or condition by Seller expressly written in this Agreement or expressly written in any instrument or document delivered pursuant to the provisions of this Agreement; (ii) the conduct of the Business prior to the Closing Date; and (iii) the asserting against the Purchaser of any liability or obligations of Seller or Shareholders, other than an Assumed Liability;

(b)     The Purchaser agrees to give prompt notice to Seller of the assertion of any claim, or the commencement of any suit, action or proceeding, in respect of which indemnity

- 23 -

may be sought hereunder.  Seller may participate in, and at the request of the Purchaser shall assume, the defense of any such suit, action or proceeding at its own expense;

(c)  Seller shall not be liable under this Section 13.2 for any settlement effected without its consent of any claim, litigation or proceeding in respect of which indemnity may be sought hereunder; and

(d)  Notwithstanding any other terms or provisions of this Agreement, (i) Seller and Shareholders shall not be obligated to indemnify Purchaser pursuant to this Section 13.2 with respect to the first $1,000 in aggregate losses claimed hereunder, (ii) if an indemnity claim is based upon the claim of a third party, the Purchaser, Seller and Shareholders shall mutually agree upon counsel to defend such claim, (iii) no claims shall be asserted by Purchaser after October 1, 1997, on account of any alleged breach of a representation or warranty to the extent that the existence of such breach or misrepresentation could have been ascertained by an examination of the books, records and accounts of Seller, (iv) Seller and Shareholders' aggregate liability pursuant to this Section 13 shall not exceed the sum of the Purchase Price plus the amount of the Assumed Liabilities as shown on the Final Balance Sheet, and (v) Seller and Shareholders shall be free from any liability for indemnification under this Section 13 for any claim for indemnification made after October 1, 2016.

13.3    Indemnification by the Purchaser:

(a)  The Purchaser hereby indemnifies Seller against, and agrees to hold it harmless from, any and all damage, loss, liability and expense including without limitation, reasonable expenses of investigation and attorneys' fees and expense in connection with any action, suit or proceeding brought against Seller incurred or suffered by Seller arising out of or resulting from any liability assumed pursuant to Section 1.4 hereof or any misrepresentation by or breach of warranty, covenant, term or condition by the Purchaser contained herein or in any schedule, exhibit, instrument or document delivered to this Agreement;

(b)  Seller agrees to give prompt notice to the Purchaser of the assertion of any claim, or the commencement of any action or proceeding in respect of which indemnification may be sought hereunder.  The Purchaser shall have the right to and shall at the request of Seller assume the defense of any such suit, action or proceeding at its own expense; and

(c)  The Purchaser shall not be liable under this Section 13.3 for any settlement effected without its consent of any claim, litigation or proceeding in respect of which indemnity may be sought hereunder.

# ARTICLE XIV

## MISCELLANEOUS

14.1   Cooperation.  The Purchaser and Seller will cooperate with the other party at the other party's request and expense in furnishing information, testimony and other assistance in connection with any actions, proceedings, arrangements, and disputes with other persons or governmental inquiries or investigations involving Seller's conduct of the Business or the transactions contemplated hereby.

14.2   Headings.   The headings of the sections of this Agreement are inserted for convenience only and shall not be deemed to constitute a part hereof or affect the meaning or interpretation of any provision hereof.

14.3   Severability.  If any provision of this Agreement shall finally be determined to be unlawful, such determination shall not affect the validity of the remaining portions of this Agreement, which shall continue in full force and effect as if this Agreement had been executed with the invalid portion thereof eliminated therefrom, it being the intent of the parties that they would have executed the remaining portions of this Agreement without including any such part or portion which may be declared invalid.

14.4   Expenses.  Except as otherwise provided herein, each party will bear its own expenses incurred in connection with this Agreement and the transactions contemplated hereby, whether or not such transactions shall be consummated.

14.5   Taxes.  Seller will bear the cost of all taxes (including but not limited to transfer taxes), if any, which may result from the transfer of the Acquired Assets from Seller to Purchaser.

14.6   Notices.  All notices, request and other communications hereunder shall be in writing and shall be deemed to have been duly given at the time of receipt if delivered by hand or communicated by electronic transmission or if mailed, three (3) days after mailing registered or certified mail, return receipt requested, with postage prepaid.

If to Purchaser, to      :          Max D. Sanders, CEO
                                    Ohmite Manufacturing Company, Inc.
                                    3601 Howard Street
                                    Skokie, Illinois  60076
                                    Telefax:  847/675-1505

Copy to:                            Daniel Corsaro
                                    Ice Miller Donadio & Ryan
                                    One American Square
                                    Box 82001

- 25 -

Indianapolis, Indiana 46282

If to Seller, to:    Paul Harris, President
                     Memcor-Truohm, Inc.
                     1320 Flaxmill Road
                     Huntington, Indiana 46750
                     Telefax: 219/356-7376


Copy to:             Robert Glenn
                     Matheny, Michael, Hahn & Bailey
                     45 W. Market Street
                     Huntington, Indiana 46750

provided, however, that if either party shall have designated a different address by notice to the other given as provided above, then to the last address so designated.

14.7    Assignment.  This Agreement shall be binding upon and inure to the benefit of the successor of each of the parties hereto, but shall not be assignable by either party without the prior written consent of the other.

14.8    No Third Parties.  Neither this Agreement nor any provisions set forth herein is intended to or shall create any rights in or confer any benefits upon any person other than the parties hereto.

14.9    Incorporation by Reference.  The schedules and exhibits to this Agreement constitute integral parts of this Agreement and are hereby incorporated into this Agreement by this reference.

14.10   Governing Law.  This Agreement will be governed by and construed in accordance with the internal substantive laws of the State of Indiana, except where the substantive laws of other jurisdiction mandatorily apply.

14.11   Counterparts.  More than one counterpart of this Agreement may be executed by the parties hereto, each of which shall be deemed an original without production of the others, but all of which together shall constitute one and the same instrument.

14.12   Complete Agreement.  This Agreement sets forth the entire understanding of the parties hereto with respect to the subject matter hereof and supersedes all prior letters of intent, agreements, covenants, arrangements, communications, representations, or warranties whether oral or written by any officer, employee, or representative of either party relating thereof.

- 26 -

14.13    Agreement to Cooperate on Public Announcements.  Seller and Purchaser each agree to consult with and cooperate with the other party on the content and time of all press releases and other public announcement relating to the transactions contemplated by this Agreement.

14.14    Broker.  The Purchaser represents to Seller that it has not employed any investment banker, finder or intermediary.  Seller represents to Purchaser that it has not retained any third party in connection with the transaction contemplated hereby, who might be entitled to a fee or commission from Seller upon consummation of the transactions contemplated hereby.

**ARTICLE XV**

**TERMINATION OF AGREEMENT**

15.1    Termination by the Purchaser of Seller.   This Agreement and the transactions contemplated hereby may be terminated at any time prior to the Closing as follows:

(a)    Mutual Consent.  By mutual consent of Seller and of the Purchaser;

(b)    Litigation.  By the Purchaser or Seller if any action, suit or proceeding shall have been instituted by any governmental authority with respect to the transactions contemplated hereby;

(c)    Failure of Conditions.  By the Purchaser if all of the conditions set forth in Section 7.1 are not satisfied, and by the Seller and Shareholders if all of the conditions set forth in Section 7.2 are not satisfied; or

(d)    Damage or Destruction.  By the Purchaser if, since the date hereof, there shall have been any appropriation of or damage to or destruction of a material part of the Acquired Assets which has a substantial negative impact on the future conduct of the business; provided, however, as to any such appropriation covered by proceeds or damage or destruction covered by insurance, the Purchaser may elect to proceed with the purchase on the terms contained herein with no diminution of the purchase price on account of such appropriation, damage or destruction and thereupon be entitled to receive all appropriation proceed or insurance proceeding, if any payable therefore.

(e) Notwithstanding any other provision to the contrary, this Agreement shall terminate on October 31, 1996, if a Closing has not occurred prior thereto; provided, however, that the parties may by mutual agreement extend such date.

(f) In the event of a termination of this Agreement pursuant to this Section 15.1, (i) Seller and Shareholders shall, within 10 days of termination, return to the Purchaser the refundable deposit paid by the Purchaser pursuant to Section 1.6(a) of this Agreement, and (ii) neither Seller, Shareholders

- 27 -

(ii) neither Seller, Shareholders nor Purchaser shall have any further liabiltiy hereunder of any nature whatsoever, including liability for damages, costs and expenses.

# DRAFT

## LIST OF EXHIBITS AND SCHEDULES

### Schedules

| <u>Schedule</u> | <u>Subject</u> |
|---|---|
| 1.2(a) | Cash and Cash Equivalents |
| 1.2(b) | Prepayments |
| 1.2(c) | Notes and Account Receivables |
| 1.2(d) | Inventories |
| 1.2(e) | Real Property |
| 1.2(f) | Equipment and Personal Property |
| 1.2(g) | Order, Contracts and Commitments |
| 1.2(j) | Intellectual Property |
| 1.4(a) | Assumed Liabilities |
| 1.4(b) | Notes and Accounts Payable |
| 1.4(c) | Assumed Contract Liabilities |
| 1.4(d) | Capital Leases |
| 3.2 | Title to Property |
| 3.3 | Real Property Conformity |
| 3.5 | Intellectual Property Limitations |
| 3.6 | Litigation |
| 3.6(d) | List of Employees |
| 3.6(e) | Collective Bargaining Agreement |
| 3.7 | Contracts |
| 3.10 | Financial Statements |
| 3.11 | Material Changes |
| 3.12 | Environmental Matters |
| 3.13 | Employee Benefit Plans |
| 3.14 | Insurance Policy |

Exhibits

| Exhibits | Subject |
|----------|---------|
| A | Products |

## SCHEDULES TO ASSET PURCHASE AGREEMENT

**Omitted from bound volume.**

## ASSIGNMENT AND ASSUMPTION OF LIABILTIES

For good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, Memcor-Truohm, Inc. ("Seller") does hereby assign, grant, sell, transfer and deliver to Ohmite Manufacturing Company, Inc. ("Buyer"), and Buyer does hereby assume from Seller, pursuant to and in accordance with that certain Asset Purchase Agreement ("Agreement") dated August 29, 1996, all of the Assumed Liabilities as that term is defined in Section 1.4 of the Agreement.

Subject to the terms and conditions of the Agreement, the Buyer hereby convenants and agrees to do, execute, acknowledge and deliver, or to cause to be done, executed, acknowledged and delivered, to the Seller, its successors and assigns, all such further acts, deeds, assignments, transfers, conveyances, powers of attorney and assurances that may be required for the better selling, assigning, transferring, conveying, delivering, assuring and assumption of the Assumed Liabilities by the Buyer, its successors or assigns.

This Assignment and Assumption of Liabilities has been duly executed by Buyer and Seller this _17th_ day of October, 1996.

OHMITE MANUFACTURING COMPANY, INC.

By: _____

Max D. Sanders, Chairman of the Board

MEMCOR-TRUOHM, INC.

By: _____

A. Paul Harris, President

438762.1

# ASSIGNMENT

WHEREAS, Memcor-Truohm., an Indiana Corporation having its principal office at 1320 Flaxmill Road, Huntington, Indiana, 46750, hereafter referred to as Assignor, is the Permittee under certain environmental permits ("Permits"), copies of which are attached as Exhibit "A"; and

WHEREAS, Ohmite Manufacturing Company, Inc., an Illinois Corporation, having its principal place of business at 3601 Howard Street, Skokie, Illinois, 60076, hereinafter referred to as Assignee, is desirous of acquiring all of Assignor's right, title, and interest in said Permits.

NOW, THEREFORE, for good and valuable consideration, (specifically set forth in a separate agreement between the Parties hereto) the receipt and adequacy of which is hereby acknowledged, said Assignor by these presents, sells, transfers, conveys and assigns unto said Assignee, as of October _17th_, 1996, all of its right, title, and interest in and to the Permits.

ASSIGNOR further agrees to execute and obtain execution of all further documents that may be necessary to secure unto said Assignee all right, title, and interest herein transferred.

Executed at Chicago, Illinois, this _17th_ day of October, 1996.

1

MEMCOR-TRUOHM, INC.

BY: _____
A. Paul Harris, President


COUNTY OF _Cook_ )
)SS:
STATE OF _Illinois_ )


On this 17th day of October, 1996, personally appeared A. Paul Harris, President, known to me to be an officer of Memcor-Truohm, Inc., the Assignor named above, and acknowledged to me that he executed the foregoing instrument on behalf of said Assignor and pursuant to authority duly received.


_____
Notary Public

My Commission Expires: _2/14/00_ .
My County of Residence is _cook_ .

```
"OFFICIAL SEAL"
REED W. RAMSAY
Notary Public, State of Illinois
My Commission Expires 2/14/00
```

F:\WP61\CANDEE\MEMCORPM.ASG                    2

Janell B. Olsbach
HUNTINGTON COUNTY RECORDER        3P
I 00217560                    Page 1 of 3
JRA Date 10/31/2000        Time 15:49:37

**Mail Tax Bills To:**                       **Tax Key No.** 014-03453-00

Innovative Packaging Associates, Inc.
1320 Flaxmill Rd.
Huntington, IN 46750

## LIMITED LIABILITY COMPANY DEED

THIS INDENTURE WITNESSETH, That **Heico Ohmite, LLC, f/k/a Ohmite Manufacturing Company, Inc.** ("Grantor") of the State of Delaware CONVEYS AND WARRANTS to **Innovative Packaging Associates, Inc.** ("Grantee") of the State of Indiana, in consideration of Ten Dollars ($10.00) and other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the following described real estate in Huntington County, in the State of Indiana:

See attached Exhibit "A".

Subject to the 2000 real estate taxes due and payable in 2001 and all assessments and liens due and owing now or in the future.

Subject to all liens, easements, rights-of-way, restrictions and limitations of record, and visible easements not of record.

The undersigned person(s) executing this deed represent(s) and certify (certifies) on behalf of the Grantor, that (each of) the undersigned is a duly elected manager of the Grantor and has been fully empowered by proper resolution, or the operating agreement of the Grantor, to execute and deliver this deed; that the Grantor is a limited liability company in good standing in the State of its origin and, where required, in the State where the real estate is situated; that the Grantor has full capacity to convey the real estate; and that all necessary action for the making of this conveyance has been duly taken.

Dated this 31st day of October, 2000

**Heico Ohmite, LLC, f/k/a Ohmite Manufacturing Company, Inc.**

By: _James C Home_

STATE OF _Illinois_         )
COUNTY OF _Cook_           )    SS:

Before me, the undersigned, a Notary Public in and for said County and State, this 26 day of October, 2000, personally appeared _James C. Horne_ of Heico Ohmite, LLC, f/k/a Ohmite Manufacturing Company, Inc., and acknowledged the execution of the foregoing deed. In witness whereof, I have hereunto subscribed my name and affixed my official seal.

My commission expires: 10/10/2003        Signature _Mary H. Boehlen_

Resident of _Cook_ County        Printed _MARY H. BOEHLEN_
                                                    Notary Public

Instrument prepared by W. Randall Kammeyer, Attorney at Law, Fourth Floor-Courtside Building, 803 South Calhoun Street, Fort Wayne, IN 46802. Attorney Identification No. 16439-49.

MAIL TO:
351 SHERMAN STREET
HUNTINGTON, IN 46750

Duly entered for taxation this 31st
day of _October_ 20 00

_____ AUDITOR
HUNTINGTON CO. IND

**"OFFICIAL SEAL"**
Mary A. Boehlen
Notary Public, State of Illinois
My Commission Expires Oct. 10, 2003

**EXHIBIT**

C

Ck - 56?,?? 82 / 18

CASE NO.  00407⌐ 9

I 00217560

## EXHIBIT A - LEGAL DESCRIPTION

Part of Tract Number Six (6) in the Reserve of 10 Sections,
Township Twenty-eight (28) North, Range Nine (9) East,
Huntington Township, Huntington County, Indiana, described as
follows:

Starting at P.K. nail marking the location of stone 13 as shown
in Survey Record "H", page 272; thence Easterly, 3365.07 feet
along the centerline of Flaxmill Road; thence Northerly,
deflecting left 90° 00' 00", 215.76 feet to a 5/8" rebar stake
on the Easterly right-of-way line of U.S. Highway #24 bypass at
station 248+50, 100 feet right of the centerline as shown on
project NO. F-888(10) dated 1963; thence Northeasterly along
said Easterly right-of-way line, 520.04 feet along a curve to
the right, not tangent to the last described line, whose radius
is 7062.03 feet and lies Southeasterly, whose chord is 519.92
feet and deflects right 43° 49' 12", from the last described
line to a 5/8" rebar stake which shall be the place of
beginning; thence along said Easterly right-of-way line the
following four courses; thence continuing Northeasterly 277.67
along said curve, whose chord is 277.65 feet and deflects right
03° 14' 09" from the last described chord to a 5/8" rebar stake
at station 256+59, 100 feet right; thence Northeasterly,
deflecting right 01° 07' 35", 41.00 feet to a 5/8" rebar stake
at station 257+00, 100 feet right; thence Northeasterly,
deflecting left 03° 43' 08", 200.42 feet to a 5/8" rebar stake
at station 259+00, 87 feet right; thence Northeasterly,
deflecting right 03° 43' 08", 62.63 feet to a 5/8" rebar stake
at the Northwest corner of Missaukee Village Addition; thence
Southeasterly, deflecting right 89° 56' 44", 446.76 feet along
the West line of said Missaukee Village Addition and Northway
Manor Addition Section "B" to a 3/4" pipe stake; thence
Southerly, deflecting right 38° 27' 28", 554.50 feet along the
West line of said Northway Manor Addition Section "B" to a 3/4"
pipe stake on the North right-of-way line of Flaxmill Road;
thence Westerly, deflecting right 89° 58' 00", 722.30 feet
along said North right-of-way line to a 5/8" rebar stake;
thence Northerly, deflecting right 90° 04' 45", 529.19 feet to
the place of beginning, containing 11.95 acres, more or less.

EXCEPT THEREFROM

Part of Tract Number Six (6) in the Reserve of 10 Sections,
Township Twenty-eight (28) North, Range Nine (9) East,

Continued on next page

-1-

I 00217560

Huntington Township, Huntington County, Indiana, described as
follows:

Starting at P.K. nail marking the location of stone 13 as shown
in Survey Record "H", page 272; thence Easterly 3365.07 feet
along the centerline of Flaxmill Road; thence Northerly,
deflecting left 90° 00' 00", 215.76 feet to a 5/8" rebar stake
on the Easterly right-of-way line of U.S. Highway #24 bypass at
station 248+50, 100 feet right of the centerline as shown on
project No. F-888(10) dated 1963; thence Northeasterly along
said Easterly right-of-way line 520.04 feet along a curve to
the right, not tangent to the last described line, whose radius
is 7062.03 feet and lies Southeasterly, whose chord is 519.92
feet and deflects right 43° 49' 12", from the last described
line to a 5/8" rebar stake; thence along said Easterly
right-of-way line the following four courses; thence continuing
Northeasterly 277.67 along said curve, whose chord is 277.65
feet and deflects right 03° 14' 09" from the last described
chord to a 5/8" rebar stake at station 256+59, 100 feet right;
thence Northeasterly, deflecting right 01° 07' 35", 41.00 feet
to a 5/8" rebar stake at station 257+00, 100 feet right; thence
Northeasterly deflecting left 03° 43' 08", 200.42 feet to a 5/8"
rebar stake at station 259+00, 87 feet right; thence
Northeasterly, deflecting right 03° 43' 08", 62.63 feet to a
5/8" rebar stake at the Northwest corner of Missaukee Village
Addition; thence Southeasterly, deflecting right 89° 56' 44",
212.41 feet along the West line of said Missaukee Village
Addition; thence Southwesterly, deflecting right 90°, 212.67
feet to a 5/8" rebar stake which shall be the place of
beginning; thence Westerly, deflecting right 38° 52' 42", 120
feet to a 5/8" rebar stake; thence Northerly, deflecting right
90°, 108 feet to a 5/8" rebar stake; thence Easterly,
deflecting right 90°, 120 feet to a 5/8" rebar stake; thence
Southerly, deflecting right 90°, 108 feet to the place of
beginning, containing 0.30 acres, more or less.

END OF EXHIBIT A

To: Raytheon, Inc.                                    October 11, 2006
Attn: Mr. Jeff Axelrod, Sr. Environmental Counsel
870 Winters St. Room 2352
Waltham, MA 02451

Dear Mr. Axelrod:

I appreciate the time you gave me last week to discuss what appears to be a potential problem relating to an environmental issue. I also apologize for the delay in sending the information; it took me longer than I thought to assemble the data.

As we discussed, Memcor-Truohm Inc. purchased the assets of the Components Operation , Memcor Division of E-Systems, Inc. This transaction took place on October 13, 1986. The terms of that sale are defined in the Sales Agreement signed by the parties on that date. A copy of the agreement is enclosed. The clauses relating to environmental issues are contained on page 5 of that document.

As you requested, we are also enclosing the sales agreement with Ohmite which was signed in October, 1996.

For information purposes, I will try to give you a quick history of the facility. The initial structure was built in the early "60s. That housed the Components Opreration of Memcor that manufactured wirewound resistors and rheotsts. At that time, Memcor also produced some special electro-mechanical assemblies in other plants in Huntington, Indiana. That business increased and around 1967 the plant in question was expanded by 35000 square feet to provide additional capacity for the special products.

Sometime in the "70s, Memcor (a consolidation of Model Engineering and Manufacturing ) obtained Government contracts for tactical radios. I believe that they were PRC-25s and /or PRC-77s. The added production required additional space so the Components Operation was down sized and the radio area (known as the Midwest Operation) was expanded in the facility.

Sometime during this period, Memcor was acquired by the Electro Systems of LTV. When E-Systems went public, Memcor became part of the E-Systems group.

The area in question in the plant was used by the Midwest Operation; primarily for degreasing, painting, and iriditing of metal parts used for the radios. This production continued through 1983 even though the majority of the Midwest operation moved to Florida in 1980. All metal fabrication for the radios remained in Huntington in the areas described above.

I believe that this is enough information to start our the program. I am enclosing all of the information that I obtained from Inovative Packaging, the current owner of the facility.

**EXHIBIT**

D

This includes a Phase 2 study, app;ication for Voluntary Remediation Program with IDEM, response from IDEM, and Inovative,'s acceptance of the VRP.

Inovative is proceeding with remediation so we should try to move on this. I recognize the inertia of large corporations, but this appears to be a small problem so it is in every ones best interest to move as rapidly as possible.

Thank you for your attention to this matter.

Sincerely, A. Paul Harris

President, Memcor-Truohm Inc.


Address; 8427 Covington Rd.
        Fort Wayne, IN 46804
        260-432-1147

RICHARD DeLANEY
MICHAEL HARTBURG
MATHEW J. ROTH                              ATTORNEYS
LISA M. GARROTT                             SINCE 1870

*Of Counsel:*
THEODORE L. BENDALL
JOHN F. BRANHAM
DENNIS L. McNEELY
WILLIAM S. GORDON. JR.

## DeLANEY  HARTBURG  ROTH  &  GARROTT  LLP

533 WARREN STREET • P. O. BOX 269 • HUNTINGTON, INDIANA 46750-0269

TELEPHONE (260) 356-1100      FACSIMILE (260) 359-1000      E-MAIL mail@dhrglaw.com

May 29, 2008

Mr. Jeff Crawford
Mr. Paul Harris
Memcor-Truohm, Inc.
1320 Flaxmill Road
Huntington, IN 46750

Gentlemen:

We are counsel for Innovative Packaging Associates, Inc. You individually and/or corporately were predecessors in interest and ownership of a certain commercial property located on Flaxmill Road in Huntington, IN, which commercial property is now owned by Innovative Packaging Associates, Inc.

Recent preliminary testing (Phase 2) has resulted in a preliminary finding of the presence of trichloroethylene and/or other potentially hazardous chemical substances or compounds under an improved portion of the premises, which substance unquestionably originated during a period of time prior to ownership of the property by Innovative Packaging Associates, Inc. These preliminary findings have resulted in the requirement, through IDEM, that additional (test) drillings be undertaken in order to access the scope or extent of subsurface contamination.

This letter will be notice to you that:

1.  as a resulting of the facts and timing of occupancy and/or ownership, and
2.  as a result of contractual and warranty relationships existing between some or all of you and Innovative Packaging Associates, Inc., and
3.  as a result of the law applicable to the facts as we now know them to be,

you are responsible and liable for the costs of continued testing and remediation, if any, connected with this matter. Innovative Packaging Associates, Inc. looks to you and demands that you comply with and perform consistent with your legal and contractual duties and responsibilities in this respect.

Sincerely,

DeLANEY HARTBURG ROTH & GARROTT LLP

John F. Branham

C· Mr. Gene Fleck, Innovative Packaging Associates, Inc.

**EXHIBIT**

*E*